# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

MICHON HOUSTON,

  *Petitioner*,

 v.

DARRELL STEWARD,[1]

  *Respondent*.

)
)
)
)
)
)
)
)
)
)

Civil Action No. 2:21-cv-10861

Hon. Sean F. Cox
United States District Judge

## REPLY IN SUPPORT OF

## PETITION FOR WRIT OF HABEAS CORPUS

SPENCER S. HUGHES
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., NW
Washington, DC 20004
(202) 389-5146
spencer.hughes@kirkland.com

JOHN R. WORTH
MI Bar No. P80928
 *Counsel of Record*
JOHN F. HARTMANN
KYLE M. KANTAREK
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000
john.worth@kirkland.com

*Counsel for Petitioner Michon Houston*

December 23, 2021

---

[1] Petitioner acknowledges the State's representation that James Schiebner is now the warden of the Muskegon Correctional Facility, *see* Dkt.8 at PageID.159, n.1, and requests that Schiebner or any party the Court deems proper be substituted as the respondent in this matter.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.........................................................................ii

INTRODUCTION ...................................................................................1

ARGUMENT ..........................................................................................2

I.     Houston's Petition Survives Any Statute of Limitations................................ 2

       A.     Houston's Petition is Timely Under § 2244 .......................... 2

       B.     Houston is Entitled to Equitable Tolling ............................. 7

II.    Houston Is Entitled To Habeas Relief ............................................. 9

       A.     The State Trial Court's Denial of Houston's Relief from Judgment Was Wrong ....................................................11

III.   Houston's Counsel's Performance Was Woefully Deficient Under *Strickland* and Resulted in Severe Prejudice................................. 17

       A.     Houston's Counsel's Refusal to Investigate Nicole Thomas Was Objectively Unreasonable .......................................... 18

       B.     Houston Easily Demonstrates Prejudice ............................ 23

           1.     Houston's *Strickland* claim is entitled to *de novo* review ......................................................... 23

           2.     Trial counsel's refusal to interview Nicole Thomas severely prejudiced Houston.................................. 26

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Avery v. Prelesnik*,
  548 F.3d 434 (6th Cir. 2008).................................................................................18

*Beuke v. Houk*,
  537 F.3d 618 (6th Cir. 2008).................................................................................27

*Davis v. Carpenter*,
  798 F.3d 468 (6th Cir. 2015)........................................................................... 27, 28

*Downing v. Metrish*,
  No. 2:08-cv-009, 2011 WL 1230831 (W.D. Mich. Jan. 31, 2011) ....................24

*Granger v. Hurt*,
  90 F.App'x. 97 (6th Cir. 2004)...............................................................................9

*Harrington v. Richter*,
  562 U.S. 86 (2011).................................................................................................24

*Hodge v. Haeberlin*,
  579 F.3d 627 (6th Cir. 2009).................................................................................27

*Holland v. Florida*,
  560 U.S. 631 (2010)...........................................................................................7, 8

*In re Vinson*,
  No. 14-2521, 2015 U.S. App. LEXIS 23331 (6th Cir. Sept. 24, 2015)...............7

*In re Wogenstahl*,
  902 F.3d 621 (6th Cir. 2018)...................................................................................7

*Jefferson v. United States*,
  730 F.3d 537 (6th Cir. 2013)...................................................................................6

*Johnson v. Williams*,
  568 U.S. 289 (2013)...............................................................................................23

*LaMar v. Houk*,
  798 F.3d 405 (6th Cir. 2015)...................................................................................7

*Pace v. DiGuglielmo*,
  544 U.S. 408 (2005).................................................................................................7

*People v. Hammock*,
  946 N.W.2d 546 (Mich. 2020) .................................................................. 15, 16, 17

*People v. Johnson*,
    502 Mich. 541 (2018) ............................................................ 13, 14, 15

*People v. Swain*,
    228 Mich. App. 609 (2010) ................................................................ 24

*Sowell v. Anderson*,
    663 F.3d 783 (6th Cir. 2011) ............................................................. 29

*Strickland v. Washington*,
    466 U.S. 668 (1984) .......................................................................... 25

*Towns v. United States*,
    190 F.3d 468 (6th Cir. 1999) ............................................................... 3

*Turner v. Romanowski*,
    409 Fed. App'x 922 (6th Cir. 2011) .................................................. 29

*Williams v. Taylor*,
    529 U.S. 362 (2000) .......................................................................... 25

**Statute**

28 U.S.C. § 2244 .................................................................................. 2, 7

**Rule**

MCR 6.502 ............................................................................................. 24

**Other Authorities**

April 7, 2003 Transcript, *Houston v. Ludwick*,
    No. 2:08-cv-10963, Dkt.7-7 (E.D. Mich. Sept. 17, 2008) ........................ *passim*

Limin Zheng, *Actual Innocence as a Gateway through the Statute-of-Limitations Bar on the Filing of Federal Habeas Corpus Petitions*, 90 Cal. L.Rev. 2101 (2002) ................................................. 6

Order, *In re Houston*, No. 18-1579, Dkt.46-2 (6th Cir. Nov. 17, 2020) ................... 8

iii

## INTRODUCTION

Michon Houston presents credible evidence from multiple witnesses who say he did not commit a murder for which he was convicted. The evidence—two affidavits—was obtained by a third party (the Michigan Law School's Innocence Clinic) while Houston was incarcerated. Once Houston obtained these affidavits, he promptly sought judicial relief. The State's arguments for why Houston should now be barred from this Court ignore that, at every step, Houston acted diligently for a man in his circumstances. The State's position would slam the door shut on any petitioner who so much as heard a rumor relevant to his case and then tried to learn the factual predicate in the following months. It runs counter to both § 2244 and principles of equity and fairness. This Court should reject it.

The evidence presented by Houston establishes that he did not commit this murder. On the contrary, another man committed the murder and orchestrated a cover-up that resulted in Houston's conviction—all while Houston's trial counsel refused to perform a bare-minimum investigation that would have stopped this scheme before Houston's trial. The State hardly engages with these shocking facts at all. Instead, it makes baseless credibility arguments (including repeating legally improper credibility determinations made by the state trial court regarding the Miller affidavit) and points to statutory standards that Houston has in fact satisfied. The State fails to acknowledge the gravity of the Petition and supporting evidence now

before the Court. The Court should refuse to dismiss the Petition and allow it to be considered.

## ARGUMENT

## I. Houston's Petition Survives Any Statute of Limitations

Houston's Petition is timely under 28 U.S.C. § 2244. But even if this Court determines that it is not, the Petition is still timely as Houston is entitled to equitable tolling to allow its consideration.

### A. Houston's Petition is Timely Under § 2244

The timeliness calculation in section 2244 is simple to compute, and here, it relies upon facts established by undisputed record evidence. Section 2244 provides for a one-year limitations period running from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1)(D). This period excludes the "time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." *Id.* § 2244(d)(2). Undisputed evidence shows that Houston timely filed his Petition within this statutory window:

- Houston received the Tony Miller affidavit in the mail on June 6, 2016. Affidavit of Michon Houston (Dec. 14, 2021) ("2021 Houston Aff.") at ¶2.[2]

---

[2] The 2021 Houston Affidavit is attached to this Reply.

2

- On June 14, 2016, Houston filed a state trial court motion for relief from judgment. *See* Dkt.9-9 at PageID.781. This motion was pending (and thus tolled his one-year clock) until October 19, 2016, when it was denied. Dkt.9-10.
- On February 22, 2017, Houston filed a motion for leave to appeal in the Michigan Court of Appeals. Dkt.9-14 at PageID.883. This motion was pending until it was denied on July 11, 2017. *Id.* at PageID.882.
- On August 23, 2017, Houston filed an application for leave in the Michigan Supreme Court. Dkt.9-17 at PageID.1086. This application was pending until it was denied on May 1, 2018. *Id.* at PageID.1085.
- On May 15, 2018, Houston signed his motion to authorize the filing of a second or successive habeas petition in the U.S. Court of Appeals for the Sixth Circuit.[3] *In re Houston*, No. 18-1579, Dkt.1-2 at 19 (6th Cir.). This motion was pending until the Sixth Circuit granted it in part on November 17, 2020. *Id.* at Dkt.46.
- On April 16, 2021, Houston filed his authorized petition for writ of habeas corpus in this Court. Dkt.1.

From June 6, 2016 to April 16, 2021, accounting for the exclusions for "pending"

filings under § 2244(d)(2), Houston's Petition is timely:

- 8 days from June 6, 2016 to June 14, 2016,
- 126 days from October 19, 2016 to February 22, 2017,
- 43 days from July 11, 2017 to August 23, 2017,
- 14 days from May 1, 2018 to May 15, 2018, and
- 150 days from November 17, 2020 to April 16, 2021,

---

[3] Because Houston filed his motion *pro se*, it is considered filed as of the date he signed it under penalty of perjury. *Towns v. United States*, 190 F.3d 468, 469 (6th Cir. 1999).

for a total of 341 days.  Since less than one year had elapsed (excluding pending-filing time), Houston's present Petition is timely, and the statute of limitations is satisfied.  Houston's Petition is not barred.

The only possible argument with this math is that June 6, 2016 is not the proper start date under § 2244(d)(1)(D)'s factual predicate standard.  The State suggests this in its Answer, arguing that "something does not add up" and asking if "it [is] Houston who is hiding something?"[4]  Dkt.8 at PageID.181-82.  The State bases this insinuation solely on the portions of Houston's June 2016 motion for relief from judgment in which he says that he "learned that Miller . . . knew the neighbor" and that "[Miller] knew about the incident and [Lavero Crooks]."  *Id.* at PageID.182.  But these statements do "add up" and do not suggest at all that Houston is "hiding something."  On the contrary, they are completely consistent with Houston's course of conduct and with Houston discovering the factual predicate for his Petition only *after* this conversation with Miller.

While he was incarcerated, Houston discussed his case with the University of Michigan Law School Innocence Clinic.  The Clinic did not represent Houston; its

---

[4] The State appears to argue that the date on which the AEDPA clock should begin is the date from which Tony Miller signed his affidavit.  *See* Dkt.8 at PageID.182–83.  But it presents no evidence of Houston learning of the facts within that affidavit from the date of the signing until June 6, 2016.  If the State is in fact arguing that the signing date started the clock, then its suggestions about what Houston learned *before* the affidavit was signed are immaterial to the time analysis.

4

student attorneys merely performed an independent investigation while reviewing

whether to take on Houston as a client.  2021 Houston Aff. at ¶3.  Around that time,

Houston met Tony Miller, a man he had never known before.  *Id.* ¶4.  Houston and

Miller were incarcerated in the same facility, but they were in different cell blocks

and did not interact with each other regularly or frequently.  *Id.*  Houston and Miller

interacted on limited occasions for only a one- to two-week period, before Houston

was transferred to a different correctional facility.  *Id.* ¶¶4, 6.  In that short time,

Houston learned that Miller had known Nicole Thomas and generally knew about

the Carlton Thomas murder.  *Id.* ¶6.  Houston reached out to the Clinic to inform

them that Tony Miller may be worth talking to.  *Id.*  After that, Houston never spoke

with Miller again.  *Id.*

On the other hand, the Clinic did speak with Miller.  The Clinic interviewed

Miller and ultimately obtained his affidavit.  The Clinic, however, did not share

details of their interview with Miller with Houston.  *Id.* ¶7.  Because the Clinic did

not represent Houston, their phone conversations were not privileged.  Their

correspondence was mainly Houston asking repeatedly for the evidence they had

obtained (so that he could use it to support his motions for relief) and the Clinic both

refusing to share that evidence as well as any details about it contents.  *Id.*

After months of Houston attempting to learn anything about the evidence that

might have been obtained by the Clinic, it finally mailed him the Miller affidavit on

June 1, 2016, which Houston received on June 6. *Id.* ¶2. On that date, Houston understood that Tony Miller had been in his vehicle and was able to be a clear eyewitness to the murder that Lavero Crooks committed. Houston immediately took action—by drafting and filing a motion for relief from judgment on the basis of the new evidence about one week later, and by continuing to diligently pursue his rights thereafter. *See* Dkt.9-9.

Houston's short initial encounter with Miller is not sufficient to start the AEDPA one-year clock. As the Sixth Circuit has recognized, AEDPA must be interpreted to avoid "a trap that renders litigation of a successful [habeas] claim effectively impossible." *Jefferson v. United States*, 730 F.3d 537, 547-48 (6th Cir. 2013). This "trap" is one that would cut against the prisoner, no matter what he does: "[W]hen a prisoner spends a tremendous amount of time establishing the validity of the facts, a court may find that the initial piece of uncorroborated information would be deemed a 'factual predicate' to start the statute-of-limitations period; if, however, a prisoner instead chooses to submit an application with the same piece of 'raw' information, it may fail the fact-pleading requirement." *Id.* (quoting Limin Zheng, *Actual Innocence as a Gateway through the Statute-of-Limitations Bar on the Filing of Federal Habeas Corpus Petitions*, 90 Cal. L.Rev. 2101, 2135 (2002)). Houston deftly maneuvered through the AEDPA maze, working diligently to gain evidence and presenting his claim to the Court once he was able to obtain it. As the

Sixth Circuit recognized, he cannot be held to the "heads, I win; tails, you lose" trap that the State suggests this Court should impose.

Houston's Petition is therefore timely, and this Court should proceed to consider the merits.

### B.      Houston is Entitled to Equitable Tolling

Even if the Court finds that Houston's Petition is not timely, the Court should still reach the merits of the Petition and find that the limitations period was equitably tolled. The statutory limitations period is not jurisdictional. *LaMar v. Houk*, 798 F.3d 405, 415 (6th Cir. 2015). In "appropriate cases," it may be equitably tolled. *Holland v. Florida*, 560 U.S. 631, 645 (2010). A petitioner is entitled to equitable tolling if he shows both "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Id.* (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)). A petitioner "need not have practiced the 'maximum feasible diligence'" to satisfy the due diligence requirement. *In re Wogenstahl*, 902 F.3d 621, 629 (6th Cir. 2018) (quoting *In re Vinson*, No. 14-2521, 2015 U.S. App. LEXIS 23331, at *6-*7 (6th Cir. Sept. 24, 2015) (analyzing parallel standard in 28 U.S.C. § 2244(b)(2)(B)). Rather, he need only show "he has done as much as could 'reasonably' be expected from someone in his circumstances." *Id.* (quoting *In re Vinson*, 2015 U.S. App. LEXIS 23331 at *7-*8) (analyzing parallel standard).

7

Houston has made these showings. Houston pursued his rights diligently throughout his incarceration. He informed the Innocence Clinic of a potential witness and followed up—repeatedly—to request information about the evidence that resulted from the Clinic's interview of Miller. 2021 Houston Aff. at ¶7. Even as he was repeatedly rebuffed, he still tried over and over to obtain the evidence. *Id.* All evidence in the record here shows a pattern of Houston trying to do as much as can "reasonably be expected from someone in his circumstances" to pursue his claim. Indeed, the Sixth Circuit has already recognized that "a person 'in [Houston's] circumstances' . . . could not have discovered Miller's affidavit earlier through the exercise of reasonable diligence." Order, *In re Houston*, No. 18-1579, Dkt.46-2 at 4-5 (6th Cir. Nov. 17, 2020).

In addition, Houston has shown that an "extraordinary circumstance stood in his way." *Holland*, 560 U.S. at 645. Houston was incarcerated. He was also stymied by the Innocence Clinic's refusal to share evidence with him. Each of these facts constitutes an extraordinary circumstance. While imprisoned, Houston could not perform any investigation, interview witnesses, or obtain evidence. He could only ask others for help. And when he asked the Clinic for help (by sharing the Miller affidavit with him), the Clinic repeatedly refused to do so. Then, Houston had no recourse, as the Clinic did not represent him in an attorney-client capacity. Requiring more from Houston "ignores the reality of the prison system and imposes an

unreasonable burden on prisoners" who have limited resources available to them. *See Granger v. Hurt*, 90 F.App'x. 97, 100 (6th Cir. 2004).

Because Houston diligently pursued his rights, even in the face of the obstacles in his way, he is entitled to equitable tolling regardless of whether his Petition is timely under § 2244. If the Court determines that either the Petition is timely under the statute or that Houston is entitled to equitable tolling, the merits of the Petition should be reached. When the merits are reviewed, it is clear that Houston is entitled to habeas relief.

## II.    Houston Is Entitled To Habeas Relief

As discussed *supra* section I, the factual predicate for Houston's claim could not have been discovered earlier. Though Houston met Miller in passing in prison and learned in a brief conversation that Miller "knew the neighbor (Nicole Thomas)," "knew about the incident," and knew Crooks by his street name, Dkt.9-9 at PageID.798, that does not mean that the ***factual predicate*** for Houston's claim could have been discovered at that time with reasonable diligence. *Supra* § I.

Nor would any reasonable juror find Houston guilty given the facts that Miller would testify to and the dominoes that would fall thereafter. As discussed in the Petition, the evidence presented completely nullifies the only "evidence" that ties Houston to his crime: purported eyewitness testimony from the actual murderer (Crooks) and another man, Johnson, whom Crooks threatened to murder and who

9

has since recanted his testimony. Dkt.1 at PageID.56-57. The State argues that "a juror would have been tasked with evaluating Miller's testimony in light of the other evidence at trial, including the testimony from both Johnson and Crooks who identified Houston as the shooter." Dkt.8 at PageID.190. True. But what the State fails to address is that evaluating Miller's testimony in light of the other evidence at trial actually makes it more powerful to a reasonable juror. Miller saw Crooks shoot Carlton Thomas and did not see Johnson at all at the time of the murder. Dkt.1 at PageID.26-28. This testimony, standing alone, should have been enough for a reasonable juror to discredit Crooks' testimony, especially considering the glaring inconsistencies between his and Johnson's testimony. Dkt.1 at PageID.21-24, 43-46. Not only that, Johnson has since recanted his testimony, such that Miller's testimony may have been enough for Johnson to tell the truth in the first instance. And Miller's testimony is the only testimony that fits the physical evidence, including the bicycle left at the scene of the crime. Dkt.1 at PageID.42-47 (Sec. I.B.), 56-57. Faced with this evidence, along with Crooks' obvious motive to lie to protect himself, no reasonable juror would have found Houston guilty of murdering Thomas. This Court should not accept the State's invitation to perform the same incorrect and legally improper credibility analysis as the state trial court.

A.    **The State Trial Court's Denial of Houston's Relief from Judgment Was Wrong**

The State repeats the state trial court's reasons for dismissing Miller's affidavit, Dkt.8 at PageID.90-91, but those reasons do not withstand scrutiny. Miller's affidavit ***exonerates*** Houston, and the "problems" the state trial court identified are actually indicators of credibility.  First, the fact that Miller never told anyone about seeing Crooks murder Thomas is easily explained; he was never asked, because Lankford (Houston's trial counsel) never interviewed Nicole Thomas.  And Miller's snap decision after witnessing a murder not to tell Nicole is completely understandable based on fear for his own life.  This fear appears to have been well-founded as Crooks threatened Johnson's life if he did not lie on the stand.  But Johnson was not even connected to the killing.  One shudders to think what Crooks would have threatened Miller with to keep him from testifying as the actual eyewitness to Crooks' crime.

Second, Miller's account is corroborated.  Miller was able to explain the bicycle left at the scene of the crime, though no other "eyewitness" could.  Dkt.1 at PageID.28.  Miller also identified Crooks' car.  Dkt.1, Page ID.67 ¶7; April 7, 2003 Transcript, *Houston v. Ludwick*, No. 2:08-cv-10963, Dkt.7-7 at PageID.475 (E.D. Mich. Sept. 17, 2008) (Houston's original federal habeas docket) (hereinafter "*Ludwick*").  Miller's story is further corroborated by Johnson's recantation, as Crooks threatened to kill Johnson if Johnson did not testify that Houston had

11

murdered Thomas.  Dkt.1 at PageID.28-29.  If Crooks was not the murderer, why threaten Johnson's life for false testimony?

Third, the passage of time between the murder and Miller's affidavit confirms that Miller was, at least initially, afraid of Crooks and attempted to put the incident out of his mind out of self-preservation.  But seeing that Houston had gone to jail for a crime Miller knows Houston didn't commit inspired Miller to come forward with the truth.  That should be respected and taken seriously.  Instead the state trial court all but mocked Miller.  Dkt.9-10 at PageID.874-75 ("Defendant wants this Court to believe that after fourteen years after [sic] witnessing a man get shot down in cold murder, that all of the sudden upon meeting defendant while he and Miller are both incarcerated, Miller comes 'clean' about what 'really happened' that fateful day.").

Fourth, Miller's inability to identify anyone but Crooks by name further cements Miller's status as a disinterested third-party witness.  Miller only knew of Crooks, likely from his status as a "wild and violent" local drug dealer.  Dkt.1, PageID.71 ¶4.  And the State ignores that Miller identified a female in the passenger seat of Crooks' car that Crooks admits was there.  *Id.* 9; *Ludwick* Dkt.7-7 at PageID.471-72.  Ultimately, the State is right that the standard for habeas relief here is "demanding," but Houston meets and exceeds that standard and this Court should grant habeas relief or, at minimum, an evidentiary hearing.

Not only that, the state court determination of Miller's credibility itself was improper. As discussed in more detail *infra* Section III, the state trial court required Houston to show that "the new evidence makes a different result probable on retrial." Dkt.9-10 at PageID.873 (emphasis added). "In order to determine whether newly discovered evidence makes a different result probable on retrial, a trial court must first determine whether the evidence is credible." *People v. Johnson*, 502 Mich. 541, 566-67 (2018). When making this determination, "the trial court should consider all relevant factors tending to **either bolster or diminish** the veracity of the witness's testimony."[5] *Id.* at 567. Importantly, "[a] trial court's function is limited when reviewing newly discovered evidence, as it is not the ultimate fact-finder." *Id.* As relevant here, "if a witness is not **patently incredible**, a trial court's credibility determination must bear in mind what a reasonable juror might make of the testimony, and not what the trial court itself might decide, were it the ultimate fact finder." *Id.*

In this case, the state court reviewed Miller's affidavit as if it was the ultimate fact finder. Dkt.9-10 at PageID.874-75 ("This Court has serious reservations about the legitimacy of Mr. Miller's accounts of what happened to the decedent. … [I]t is within the trial court's discretion to determine the credibility of the confessor."); *id.*

---

[5] All emphasis added unless otherwise noted.

13

("Defendant wants this Court to believe that..."). In summary fashion—with no citations across a paltry five sentences of discussion—the state court stated its views on purported weaknesses in the affidavit and concluded it was not credible. While the discussion immediately above makes clear that Miller *is* credible, the state court judge made absolutely no determination "whether a reasonable juror might conclude that [Miller] is nonetheless credible with regard to the facts at issue here." *Johnson*, 502 Mich. at 570. Indeed, the word "juror" does not even appear in the opinion at all. *See* Dkt.9-10. Nor did the state court discuss *any* of the factors tending to bolster Miller's testimony, including those discussed above and in the Petition. The State asks this Court to not only credit this improper credibility determination, but make the same one. The Court should decline to do so.

Aside from being wrong on the law and wrong on the facts (wrongly stating that Miller was "unable to identify anyone else who was present"), the state trial court also improperly focused on its own jaded view of wrongful convictions in dismissing the possibility that "fourteen years after witnessing a man get shot down in cold murder, that all of the sudden upon meeting defendant while he and Miller are both incarcerated, Miller comes 'clean' about what 'really happened' that fateful day." Dkt.9-10 at PageID.875. This case is thus similar to *Johnson*, where the trial court made its own credibility determination (ignoring what a reasonable juror would believe) based on its own experiences and suppositions (the court's own

memory), incorrect factual determinations (that the witness was asleep), and a complete lack of focus on the reliable aspects of the witness testimony. *Johnson*, 502 Mich. at 568-71. Here, as in *Johnson*, "[w]hen considering [Miller's] testimony in its entirety, it is clear that his testimony is not wholly incredible … and that a reasonable juror could find his testimony worthy of belief on retrial." 502 Mich. at 571.

This case is also similar to the Michigan Supreme Court's decision in *People v. Hammock*. 946 N.W.2d 546 (Mich. 2020). There, a defendant convicted of second-degree murder filed a motion for relief from judgment and produced an affidavit many years after his conviction from an eyewitness ("Carter") who observed the crime. *Id.* at 547-48 (J. Cavanagh, concurring). An eyewitness to the crime who was himself shot ("Pippen") testified that the defendant shot both Pippen and the decedent at a house the decedent lived at. *Id.* at 547. Carter's affidavit told a different story in which the decedent and Pippen purchased marijuana from Carter (then 13) and Carter observed the decedent and Pippen robbing that same house. *Id.* at 548. Then, Carter explained, a different man drove up, walked into the house, yelled at Pippen and the decedent for being in the different man's house, and then Carter heard gunshots. *Id.* After the gunshots, Carter saw the different man drive away. *Id.* The judge who rendered the initial bench trial verdict (coincidentally the same judge that presided over Houston's trial) had retired and a new judge, after

denying the motion for relief from judgment and granting an evidentiary hearing after remand, changed course and declined to take testimony. *Id.* at 548-49.

The Michigan Supreme Court vacated the trial court's decision and remanded for an evidentiary hearing. In a concurring opinion, Judge Cavanagh explained, citing *Johnson,* that the trial court "abused its discretion by failing to consider the offer of newly discovered evidence ***in the context of the evidence presented at trial***." *Id.* at 550. There, "[e]ither Carter's affidavit is false, or Pippen's testimony is false. Both cannot be true." *Id.* And further, "there was strong contemporaneous evidence that a larceny was ongoing when the shooting occurred … but there was no evidence at trial to tie the robbery to the shooting" and "Carter's version of events connects those loose ends." The same here: Either Miller's affidavit is false, or Crooks' testimony is false; both cannot be true. And as set forth in the Petition, no physical evidence tied Houston to the crime and the two purported eyewitness accounts were inconsistent and far from fulsome. Miller's affidavit explains why. At minimum, this Court should grant an evidentiary hearing and not dismiss the Petition based on the legal error of the state trial court.

*Hammock* also explains why the state trial court's personal skepticism about the Miller affidavit is inappropriate. In *Hammock*, a dissenting judge (Markman) "expresse[d] disbelief that Carter was selling marijuana at 2 a.m. when he was 13 years old, that Carter and [the] defendant happened to be incarcerated together eight

16

years later, and that Carter happened upon the Court of Appeals opinion affirming defendant's conviction." *Id.* at 551.   Justice Cavanagh explained, "it is true that people in prison run into past acquaintances, that some people serving long prison sentences spend long hours in the law library falling down legal rabbit holes, and that some of those people were selling marijuana at 2 a.m. when they were 13 years old." *Id.*   She continued, "[t]hese experiences are unlike my own, and though I cannot speak for him, they may also be unlike Justice Markman's.   But maybe for exactly that reason the judicial function in this matter is not to pass on the credibility of Carter's story, but only to ask 'whether a reasonable juror *could* find the testimony credible on retrial." *Id.* (emphasis in original).   Houston should not remain in prison for a crime he didn't commit simply because the state court did not have the same experiences as Houston and expressed disbelief in Miller's testimony.   This is especially true where the state court made its own credibility determination in contravention of Michigan law.

### III.   Houston's Counsel's Performance Was Woefully Deficient Under *Strickland* and Resulted in Severe Prejudice

At the outset, the State dedicates two full pages of its brief to explain the "highly deferential" nature of review of a claim for ineffective assistance of counsel under *Strickland*.   Dkt.8 at PageID.191-92.   This includes "strong presumption[s]," an objectively reasonable standard, and "affirmatively entertain[ing] the range of possible reasons" counsel may have had for their actions.   Yet completely absent

from the State's Answer is any attempt to address the fact that, in 2008, Houston's counsel, David E. Lankford, ***was found to have performed deficiently*** under the same "highly deferential" review, in a jury trial that took place in 2000.  Dkt.1 at PageID.40-41 (citing *Avery v. Prelesnik*, 548 F.3d 434 (6th Cir. 2008)).  As set forth in the Petition, in *Avery*, Lankford "never personally attempted to contact *any* of the potential alibi witnesses" and never interviewed them.  *Id.*  Lankford again brought his deficient performance to bear for Houston's case in 2003, refusing to interview potential alibi witness Nicole Thomas, who Houston asked to lock his door ***just hours*** before the murder.  Dkt.1, PageId.70, 73.  Had Lankford simply interviewed Nicole Thomas, she would have led him to Miller, who had been waiting outside of her house and saw Crooks murder Thomas.  As set forth in the Petition, Lankford's objectively unreasonable failure to investigate a known exculpatory witness deprived Houston of his Sixth Amendment rights.  Dkt.1 at PageID.33-47.

### A.   Houston's Counsel's Refusal to Investigate Nicole Thomas Was Objectively Unreasonable

In the Petition, Houston set forth nine pages of evidence and argument as to why Houston's counsel's performance was objectively unreasonable.  Dkt.1 at PageID.33-42.  The State's Answer all but concedes this point.  The State addresses none of Houston's cases and indeed cites ***none*** of its own.  Dkt.8 at PageID.194-97.  Instead, the State (1) criticizes Houston for being the only one on record asking his own counsel to investigate Nicole Thomas, and (2) meekly suggests that because

18

Houston's counsel requested Court assistance in locating a witness, Houston's counsel's performance must have been reasonable. Neither of these arguments is well-founded or persuasive.

First, the State complains that Houston's account of his counsel's performance is undermined by the record because "nowhere in the record is there anything suggesting that Houston wanted his counsel removed." Dkt.8 at PageID.195. Initially, the absence of support in the record does not "undermine" Houston's evidence, it simply does not bolster it. And what does the State expect? Was Houston to stand up in Court and exclaim that Lankford refused to investigate Nicole Thomas? Of course not; Houston was not aware of what Nicole Thomas would say because Lankford did *no investigation whatsoever*. Not only that, Houston was a poor defendant saddled with an inept public defender and could not afford his own counsel. Houston's only legal advice thus came from the singular individual who refused to do a simple investigation into a known, potentially exculpatory witness. Expecting the same attorney who rendered deficient performance under *Strickland* to correctly inform his client how to combat that deficient performance just adds insult to injury. The State's supposition regarding the record that Houston *could* have made is largely irrelevant. If the State wanted to rebut Houston's evidence, it has had many years to find evidence to do so.

Second, the State faults Houston for not raising counsel's failure to interview Nicole Thomas on appeal. Dkt.8 at PageID.195-96. But again, ***Houston did not know what Nicole Thomas would say***. Further, Houston did inform his appellate counsel that Nicole Thomas was the last person he spoke with in the neighborhood that night. 2021 Houston Aff. at ¶8. However, when appellate counsel attempted to contact Ms. Thomas, she had moved out of the neighborhood and had not left contact information. *Id.* How Houston could raise such an issue on appeal without any knowledge of what Nicole Thomas would say is anyone's guess.

Third, the State argues, without support, that "counsel was actively involved in trying to produce witnesses and present a strong case." Dkt.8 at PageId.196. But Lankford called ***no witnesses*** and presented ***no evidence*** at trial at all. *Ludwick* Dkt.7-7 at PageID.649-50. And the evidence now assembled and presented by Houston shows that the prosecution's main witness (Crooks) was the actual murderer, the prosecution's only other witness (Johnson) was threatened into testifying falsely, and a disinterested third party (Miller) witnessed the murder while waiting for the woman who he had been dating (Nicole Thomas) to come outside that night. If counsel were trying to "produce witnesses and present a strong case," he needed only to interview Nicole Thomas as Houston requested, but he did not.

The State cites Lankford's statement after the second day of trial that "he had been requesting assistance in trying to locate a witness that had provided a statement

to the police and requested a warrant" as somehow supporting his reasonableness. Dkt.8 at PageID.196.   But the actual testimony only highlights his deficient performance.   Lankford stated: "Basically I've asked for assistance regarding a witness who *I had no information on other than she had a statement taken by the police*."   *Ludwick* Dkt.7-7 at PageID.599 (emphasis added).   Apparently, counsel waited until after the second day of trial to inform the judge that he needed a warrant for a witness "who [he] had no information on."   *Id.*   Counsel did not even do a sufficient investigation to determine what evidence this witness had as of the end of the second day of trial.   The State supposes, quite bizarrely, that if this witness was Nicole Thomas "it completely undermines Houston's claim that counsel failed to take reasonable steps to interview her." Dkt.8 at PageID.196-97.  Quite the opposite. It confirms that Lankford failed to take reasonable steps to conduct a timely interview of a crucial witness, and failed to even *find out her name*.  *See Ludwick* Dkt.7-7 at PageID.643 (the prosecution stated that "we have no way to even determining [sic] what her true identity is").   Not only this, we now know Nicole Thomas was at a minimum valuable for her connection to Tony Miller.  Putting her on the stand without interviewing her first would not have led to that discovery. Unfortunately for Mr. Houston, this deficient performance was par for the course. To be sure, Lankford stated that this unnamed witness with unknown testimony was

"valuable to the defense," but that was because he quite literally had prepared no defensive case. *Id.* at PageID.642-43.

Further, we know this unnamed witness was not Nicole Thomas.[6]  Ms. Thomas is listed in the police report by her real name. Dkt.1 at PageID.62-63.  Still, the State argues that even if it was not Nicole Thomas it "undermines Houston's claims" because "if counsel really told him that he was not going to do extra work and interview one witness, it is unlikely that he would take action to request the trial court to issue a warrant to produce another witness." Dkt.8 at PageID.197.  But the bar cannot be so low.  Asking the court, two days into the trial, to find a witness that the State, almost 20 years later, supposes could possibly be a witness that counsel's ***own client*** instructed him to find without knowing her name or what she would testify to cannot possibly be sufficient representation.  There was no "action" taken. Indeed, the record shows that Lankford could have demanded that this witness be produced, but he declined to do so. *Ludwick* Dkt.7-7 at PageID.643-44.

Houston told Lankford about Nicole Thomas.  The State suggesting otherwise ***heavily*** strains credulity.  Dkt.8 at PageID.197.  In Houston's own words: "Even without me informing counsel of the potential witnesses that may have been

---

[6]   It also does not appear to be Tennisha Watson.  Dkt.8 at PageID.197 n.6. Lankford separately stated officers "weren't able to find Ms. Watson." *Ludwick* Dkt.7-7 at PageID.644.

favorable evidence for the defense, as a professional counsel [he] was suppose[d] to do pre-trial investigation on his own, and interview the names at the address in the police report for potential witnesses." Dkt.1 at PageID.73-74. Nicole's address was "***within 50 feet*** of the crime scene." *Id.* at PageID.73. Lankford apparently believed interviewing such a witness was "extra work," unreasonably refused to do so, and caused nearly two decades of imprisonment for an innocent man.

### B.   Houston Easily Demonstrates Prejudice.

#### 1.   Houston's *Strickland* claim is entitled to *de novo* review.

The State admits, as it must, that AEDPA only "prevents a federal court from granting habeas corpus relief based on any claim 'adjudicated on the merits' in state court." Dkt.8 at PageID.198; *see Johnson v. Williams*, 568 U.S. 289, 298 (2013). Tellingly, the State does not cite to any portion of the state court's decision or discuss how Houston's *Strickland* claim was adjudicated on the merits, because it was not. Dkt.8 at PageID.200. In fact, the state court explicitly did not adjudicate Houston's *Strickland* claim on the merits, but dismissed it pursuant to procedural state court law.

The state court specifically stated that Houston "allege[d] eight errors" including "[1] Defendant argues that he was deprived [sic] his constitutional right to the effective assistance of counsel where counsel failed to investigate and present an exculpatory witness during trial." Dkt.9-10 at 2. Based on MCR 6.508(D), the state

court found that of "all of the issues defendant has raised only his newly discovered evidence, issue two (2), survives." *Id.* at 3. The state court simply did not address issue [1] at all. Dkt.9-10 at 5 ("As this is a successive motion for relief from judgment, defendant's other issues don't survive MCR 6.502(G) scrutiny, and will not be discussed further."). There was no further substantive adjudication of any of Houston's claims. The Michigan Court of Appeals denied leave to file an appeal (Dkt.9-14 at 1), and the Michigan Supreme Court denied leave to appeal the Michigan Court of Appeals' order. Dkt.9-17 at 1.

The United States Supreme Court has addressed this exact issue. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits ***in the absence of any indication or state-law procedural principles to the contrary***." *Harrington v. Richter*, 562 U.S. 86, 99 (2011). MCR 6.502(G) is undeniably such a procedural principle. *See People v. Swain*, 228 Mich. App. 609, 636 (2010) (referencing "the procedural bar of MCR 6.502(G)"); *Downing v. Metrish*, No. 2:08-cv-009, 2011 WL 1230831, at *5 (W.D. Mich. Jan. 31, 2011) (describing "MCR 6.502(G)(1)" as "a state procedural rule"). And more than a simple "indication," the state trial court explicitly stated that "defendant's other issues [besides issue [2]] don't survive MCR 6.502(G) scrutiny, and will not be discussed further." Dkt.9-10

24

at 5; *see also id.* at 3. Thus, Houston's *Strickland* claim simply was not adjudicated on the merits and 28 U.S.C. § 2254(d) does not apply.

Nor can the state trial court's decision on Houston's issue [2] substitute for an "adjudication on the merits" of Houston's *Strickland* claim. First, as discussed immediately above, Houston's *Strickland* claim was set forth at issue [1], which was explicitly not addressed. Second, the state trial court's newly discovered evidence test simply did not apply *Strickland*'s prejudice standard. Instead, the state trial court required Houston to show that "the new evidence makes a different result ***probable on retrial***." Dkt.9-10 at PageID.873 (emphasis added). But *Strickland*'s standard requires "***a reasonable probability*** that … the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Therefore, even if the state trial court's decision could be read to address the prejudice prong of *Strickland* in any way (and it explicitly does not), it would have done so contrary to *Strickland*. *See Williams v. Taylor*, 529 U.S. 362, 405-06 (2000) ("A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases.").

Finally, as set forth *supra* Section II.A, the state trial court improperly made its own credibility determination with regard to Miller's affidavit. Thus, even if the

state trial court **_did_** adjudicate Houston's _Strickland_ claim on the merits (it did not),

it unreasonably applied _Strickland_'s prejudice standard and the Petition is subject to

_de novo_ review.

> ### 2.      Trial counsel's refusal to interview Nicole Thomas severely prejudiced Houston.

It is difficult to imagine more prejudicial circumstances than those set forth in

the Petition.   Dkt.1 at PageID.42-47.   Briefly, Houston's counsel's failure to

investigate a known potentially exculpatory witness (Nicole Thomas) deprived him

of critical evidence showing that the actual murderer was the prosecution's key

witness.  Not only that, Miller's evidence flatly contradicts and therefore undermines

all of the evidence of Houston's guilt— the purported eyewitness testimony that was

the sole support for his conviction.  The State knows this.  Faced with the extremely

prejudicial failings of Houston's counsel, the State complains that (1) it is

speculative that Nicole Thomas would have led trial counsel to Miller and (2) Miller

"has never stated that he would have been willing to testify at Houston's trial." Dkt.8

at PageID.200-02.  Neither argument is persuasive.

The State's position is that Houston's claim "must be based upon more than

mere speculation that further investigation would have been beneficial," and it cites

three cases in support.  Dkt.8 at PageID.200.  These cases are easily distinguishable.

_Hodge v. Haeberlin_ rejected a claim that counsel failed "to make further

investigation of a potential alternative suspect" as having "no basis in the record"

because a detective specifically "pursued this lead … until it proved to be a dead end." 579 F.3d 627, 650-51 (6th Cir. 2009). Here, Lankford refused even to pursue the Nicole Thomas lead, let alone pursue it until it proved to be a dead end.

*Beuke v. Houk* concerned an allegation that counsel failed to perform adequately by "unreasonably delay[ing] their mitigation investigation until after the jury issued its guilty verdict." 537 F.3d 618, 644 (6th Cir. 2008). But the Sixth Circuit's discussion of "evidence to confirm or deny that conclusion" was specifically with respect to the reasonableness prong of *Strickland*, **not prejudice**. *Id.* And further, counsel's billable hours sheets showed much time spent pre-conviction on activities that "could have been focused on the mitigation investigation," such that the Court could not find deficient performance. *Id.* Here, Houston welcomes an evidentiary hearing where the State is free to present evidence of Lankford's performance. Until then, there is no such evidence to overcome.

The State's citation to *Davis v. Carpenter* likewise does not concern the question of prejudice. 798 F.3d 468 (6th Cir. 2015). The State again excerpts from the Sixth Circuit's discussion of counsel's reasonableness in his "efforts to find an expert." *Id.* at 474. There, counsel found an expert for the first trial, but was unable to find one for the second after the first expert refused. *Id.* at 472. Counsel "obtained a continuance to gain more time to find a replacement" and sought help from the prior expert's attorney who "had attended medical school [and] knew

27

doctors 'all over the southeast'" but "could not find any local doctors willing to testify." *Id.*   Counsel did not stop there; he and the prior expert's attorney "broadened the scope of their search" and talked to numerous doctors. *Id.* at 472-73.  Here, in **stark contrast**, Lankford had to only contact **one** person who lived 50 yards from the crime scene and was specifically identified by Houston, but did not.

The State's only claim based on this proposition is that "it is entirely speculative to assume that Nicole would have told counsel" about Miller.  Dkt.8 at PageID.201.  But Miller's affidavit states that he arrived at the crime scene "to pick up Nicole Thomas" and "waited in [his] car while Nicole put her daughter to bed." Dkt.1 at PageID.67 ¶¶3-4.  And after Miller left, "Nicole called [his] cell phone in order to ask if [he] was alright, as she stated she had heard shots." *Id.* at PageID.68 ¶19.  Thus, if Lankford had only asked Nicole what she was doing at the time of the murder, a threshold interview question, she would have stated that she heard shots and called Miller, who was waiting outside her house for her to put her daughter to bed.  That is all that Lankford had to do.

The State's last argument is that "Miller has never stated that he would have been willing to testify at Houston's trial."  Dkt.8 at PageID.201-02.  If Lankford had simply interviewed Nicole Thomas, Miller likely would not have even had to testify at a Houston trial because there would not have been a Houston trial at all, as Miller's evidence makes clear that Crooks should have been tried for the murder of Carlton

28

Thomas (along with numerous other crimes including perjury and witness tampering).  This is plainly the kind of prejudice contemplated by *Strickland*.

Even so, the State's cases do not support its position that Miller's affidavit must state he would have testified at trial for this Court to find prejudice.  The portion of *Sowell v. Anderson* cited is simply a concurring/dissenting opinion—the State offers no rule that affidavits failing to contain the magic words "I would have been willing to testify to these facts" are infirm.  *See* 663 F.3d 783, 802 (6th Cir. 2011) (Batchelder, C.J., concurring in part and dissenting in part).   And *Turner v. Romanowski* concerned an affidavit **by the petitioner** about what another individual would say.  409 Fed. App'x 922, 927 (6th Cir. 2011).  But Miller's testimony is not contained in an affidavit from Houston.  It is his own testimony, under oath.  Dkt.1 at PageID.67-68.  Further, if Miller's affidavit is not satisfactory in this regard, the Court need only hold an evidentiary hearing and examine Miller and Houston there.

## SUMMARY AND REQUEST FOR RELIEF AND ORAL ARGUMENT

For the reasons set forth above and in the Petition for Writ of Habeas Corpus and the Memorandum in Support thereof, Dkt.1, this Court should (1) after full consideration, grant the Petition and order that Michon Desmond Houston either be promptly retried or released from custody; (2) grant such other, further, and different relief as the Court may deem proper and just under the circumstances; and (3) grant oral argument in this matter.

Respectfully submitted,

SPENCER S. HUGHES
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave. NW
Washington, DC 20004
(202) 389-5146
spencer.hughes@kirkland.com

s/John R. Worth
JOHN R. WORTH
 *Counsel of Record*
MI Bar No. P80928
JOHN F. HARTMAN
KYLE M. KANTAREK
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000
john.worth@kirkland.com

*Counsel for Petitioner Michon Houston*

December 23, 2021

## CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2021, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Eastern District of Michigan by using the CM/ECF system. I certify that I also caused a paper copy of this petition to be mailed to the below address:

John S. Pallas
Michigan Department of Attorney General
Appellate Division
G. Mennen Williams Building
525 West Ottawa Street
P.O. Box 30217
Lansing, MI 48909

s/John R. Worth
John R. Worth

# ATTACHMENT

## AFFIDAVIT OF MICHON D. HOUSTON

**BEFORE ME,** the undersigned Notary, ___*Jason Jones*___, on this *12/14/21* day of December, 2021, personally appeared Michon D. Houston, who being by me first duly sworn, on his oath, deposes and says:

1. My name is Michon Houston, and I make this affidavit from personal knowledge of the matters addressed herein.

2. On June 6, 2016, I received the Tony Miller affidavit by mail, sent to me by the University of Michigan Law School Innocence Clinic (the "Clinic"). I had not seen the Miller affidavit before this date, and I had not been informed of its contents before I received it.

3. After my conviction and during my incarceration, I was in contact with the Clinic about my case. The Clinic told me that it was investigating whether to take me on as a client. I never had an attorney-client relationship with the Clinic.

4. I met Tony Miller when we were both incarcerated at *New berry Corr. Fac.* We were in different cell blocks and did not have much chance to speak with each other.

5. ~~I learned from Miller that he had known Nicole Thomas and generally knew about the Carlton Thomas murder. At this time, I did not learn whether he had knowledge relevant to my claims or whether he witnessed Lavero Crooks commit the murder.~~ *M.H*

6. After I learned that Miller had known known Nicole Thomas and generally knew about the Carlton Thomas murder, I contacted the Clinic to inform them that Miller might be a useful witness. Within one or two weeks of speaking with Miller, I was transferred to *Kinross Corr. Fac.* and never talked to him again.

7. I contacted the Clinic on multiple occasions asking for information about its investigation and its interview with Miller. The Clinic refused to share information with me. The Clinic told me that our communications were not privileged because we did not have an attorney-client relationship, so it could not share information with me. I repeatedly asked the Clinic for this information, and the Clinic repeatedly refused to provide any of it. Finally, the Clinic mailed me the Tony Miller affidavit, which I received on June 6, 2016.

8. After my conviction and during my direct appeal, I told my appellate lawyer that Nicole Thomas was the last person I spoke to in the area of the murder on the night Carlton Thomas was shot. My lawyer told me that Nicole Thomas had since moved out of the neighborhood and had not left contact information, so she could not be located.

Further, your affiant sayeth naught.

_[signature of affiant]_

Michon D. Houston
MDOC No. 316461
Muskegon Correctional Facility
2400 S. Sheridan Dr.
Muskegon, MI 49442

_[Notary Seal:]_

_[signature of Notary]_

_[printed name of Notary]_

**JASON JONES**
Notary Public, Muskegon County, MI
My Commission Expires 12/17/25
Acting in the County of Muskegon

NOTARY PUBLIC

My commission expires: _/2 -/7 - 25_ , 20 _25_ .

2