UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHON HOUSTON,

               Petitioner,

                                         CASE NO. 2:21-CV-10861

v.                                    HONORABLE SEAN F. COX

JEFF TANNER,[1]

               Respondent.

_____/

## OPINION AND ORDER DENYING AND DISMISSING WITH PREJUDICE THE HABEAS PETITION BUT GRANTING A CERTIFICATE OF APPEALABILITY

**I.    Introduction**

      This is a habeas case brought pursuant to 28 U.S.C. § 2254.   Michigan prisoner Michon Houston ("Petitioner") was convicted of first-degree premeditated murder, felon in possession of a firearm, and possession of a firearm during the commission of a felony following a jury trial in the Wayne County Circuit Court.   He was sentenced to life in prison without the possibility of parole, a concurrent term of one to five years in prison, and a consecutive term of two years in prison in 2003.   Petitioner previously filed a habeas petition challenging these convictions, which was denied on the merits in 2011.   *Houston v. Ludwick*, No. 2:08-cv-10963, 2011 WL 1135465 (E.D. Mich. March 25, 2011) (Zatkoff, J.), cert. app. den., No. 11-1528 (6th Cir. Jan. 5, 2012). Petitioner, however, has obtained appellate authorization to file a second habeas petition.   *See In re Michon Houston*, No. 18-1579 (6th Cir. Nov. 17, 2020).   In his current habeas petition, filed

---

[1]Petitioner is currently confined at the Macomb Correctional Facility in Lenox Township, Michigan.  *See* Petitioner's Offender Profile, Michigan Department of Corrections' Offender Tracking Information System ("OTIS"), https://mdocweb.state.mi.us/OTIS2/otis2profile.aspx?mdocNumber=316461.   The proper respondent in this case is the warden at that facility who has custody of Petitioner.  *See* 28 U.S.C. § 2243; 28 U.S.C. foll. § 2254, Rule 2(a); Fed. R. Civ. P. 81(a)(4).   Accordingly, the Court amends the caption to name Warden Jeff Tanner as Respondent.

through counsel, Petitioner asserts that trial counsel was ineffective for failing to investigate a known witness.   For the reasons stated herein, the Court denies and dismisses with prejudice the habeas petition, but grants a certificate of appealability.

## II.    Facts and Procedural History

Petitioner's convictions arise from the shooting death of Carlton Thomas.   At trial, two witnesses, Lavero Crooks and Jovan Johnson, testified that Petitioner shot Thomas multiple times in an empty parking lot around 5:00 a.m. on September 6, 2002.   Petitioner, Crooks, and Johnson were drug dealers and Thomas was apparently attempting to purchase drugs.   On direct appeal, Petitioner's defense counsel summarized the trial testimony as follows:

Lavero Crooks testified that he had known Defendant since July of 2002 and that they had been friends. (II 101).[4] On the date in question, Crooks was selling ("grinding") crack cocaine in the area of Linwood and Buena Vista. (II 98). He had been out there the entire night, sitting in his car, a 1984 Cutlass. He was parked on Buena Vista, in front of a house next to a vacant lot. (II 99-100, 151). There was a pile of debris in the vacant lot, next to where he was parked. (II 124, 143). At around 5:00 am, Defendant, Defendant's girlfriend "Powder", and Jovan Johnson ("JW"), were on the porch of a residence on Buena Vista that was across from the vacant lot. (II 102). Both Johnson and Defendant sold drugs. (II 127-128). They all regularly used this porch to sell drugs. and Crooks had spent the previous night at that residence.[5] (II 102-103).

Crooks continued that he observed someone walking through the vacant lot (II 103). He recognized the man as someone who regularly bought drugs from Jovan Johnson. Crooks explained that the normal procedure would be for the sellers to race up to a prospective customer. (II 104). Defendant approached the man,[6] and asked what he needed. (II 147-148). Crooks heard Defendant say, "Oh, you ain't gonna deal with me, this is my block."(II 106-107, 130). The man responded that he could deal with whomever he wanted to. (II 107). Defendant crossed back to the house, went inside, came out with his .40 caliber gun, and fired a shot from the porch. (II 106-107, 131-133, 140).[7] The man tried to run, then fell on his stomach in the grass, near one of the two trees in the lot. (II 107-108, 135). Defendant went over and rolled the man over onto his back (II 108-109, 135). Defendant said, "I shot that nigga in his face, first shot." Defendant searched the man's pockets, then started firing more shots." (II 109, 135-136).

Crooks drove off. (II 109). He took the young lady that was with him in his car, and who had also witnessed the shooting, to her home. (II 110, 125). He returned to the

area at around 6:30 am, and saw that there were lots of police there. He offered no information. (II 146-147, 152).

Over defense objection, the prosecutor questioned Crooks about the circumstances ending his friendship with Defendant. (II 110). Crooks testified that, sometime in November of 2002, he fell asleep in his car on the block, and woke up to find Defendant with a gun to his head, threatening to kill Crooks if he did not get off the block, telling Crooks it was his block. Defendant's cousin grabbed the gun, and Crooks got away. Crooks reported this incident to the police, but did not mention the shooting. (II 110-111, 138).

Crooks continued that, on November 9, 2002, Officers Adams and Moss came to his house, and he told them that he knew how to find Defendant. He told the officers that if he drove through the Buena Vista and Linwood area, where they sold drugs every day, with his music on, Defendant "would run out with a gun shooting." (II 112). Everyone in the area knew Crooks' car. (II 113). Per their plan, Crooks parked by the vacant lot, and Defendant and his cousins ran out of a house, a four family flat. (II 114). There were a lot of police there, and Defendant ran back inside. (II 114). The police searched the house, and eventually brought Defendant out. (II 115).

Crooks further provided that, on November 11, 2002, he went to 1300 Beaubien and gave a statement about the shooting at bar. (II 115). He denied that he had been promised anything to testify in this case, or that he was testifying because Defendant had put a gun to his head. (II 116).

On cross-examination, Crooks admitted he never told the police that someone was in the car with him the morning of the shooting. (II 125). He also admitted that he never told the police that Defendant had searched the deceased's pockets. (II 125, 136). He also acknowledged that the police had confronted him three times about the shooting, before he made a statement. (II 126). They had come to Linwood and Buena Vista while he was out there selling drugs. (II 127). Each time, he had denied knowing anything. (II 150, 155). One time, the investigators apprehended him. (II 156). He claimed to have seen Defendant with the .40 caliber gun plenty of times, but agreed he never told that to the police either. (II 136-137). He denied that the debris or the weeds in the vacant lot blocked his view that morning (II 144), despite photographs taken by the police at the scene that indicated to the contrary (II 142-144).[8] He never saw the deceased run around to the back side of one of the trees in the lot. (II 152).

Crooks further acknowledged that Jovan Johnson was his friend, but denied knowing, at the time he made the statement implicating Defendant in the shooting, that Johnson had been arrested on some charges. (II 144-145).

Jovan Johnson ("JW") testified that, at the time m question, he had known

Defendant for about a year. (II 160). In the early morning hours of September 6, 2002, he and Defendant and Powder were drinking at a motorcycle club for a few hours, and then, at around 4:00 or 5:00 am, went to a house at Linwood and Buena Vista, where the two men would regularly sell drugs. (II 162-163, 173, 187-188, 193-195). Lavera Crooks sold in the same area, but there was no bad blood between them. (II 163, 187, 196).

Johnson continued that he, Defendant, and Powder were sitting on the porch, right across from the vacant lot, when they saw a man cutting through the lot. (II 163-164). Johnson recognized him as someone to whom he had sold crack a few times. (II 188).

Defendant and Johnson both yelled to him, to find out what he needed. (II 164, 188). Johnson stayed on the porch, and Defendant went to the vacant lot and talked to the man. (II 165). There was some conversation, which became more heated, and then Johnson heard Defendant yelling, "Bitch."(II 167, 186, 190). Defendant chased the man around the tree, and then Defendant fired two or three shots. (II 167-168, 190, 198). The man fell on his back, near the tree. (II 168). Defendant stood over the fallen man, and fired two or three times. (II 168-169). Defendant returned to the porch, and ordered Johnson to go check if the man was dead. (II 170). Defendant had a gun in his hand; Johnson had never seen it before. (II 171, 186). Johnson determined that the man was still breathing, but told Defendant he was dead. (II 171, 200). Defendant and Johnson drove off, but Powder refused to get in the car. (II 172, 201).

Johnson did not see Lavero Crooks or anyone else out there that morning. (II 175, 195-196). He was familiar with Crooks' blue 1984 Cutlass. (II 196). He denied that Defendant had returned to the house to get the gun. (II 187). He did not see Defendant turn the man over, or go through his pockets. (II 191, 211). Johnson did not go through the man's pockets either when he checked on him. (II 210).

Johnson continued that, within a week of the shooting, the police attempted to question him about it, but he told them he knew nothing. (II 183-184). Sometime later, he "caught a drug case" and was in jail. (II 173). On November 17, 2002, homicide detectives came to talk to him about the shooting, and told him that he would not go to jail "for accessory" if he cooperated with them. (II 174-175, 178). The detectives provided him with many details about the shooting (II 179), and told him that they knew he might be involved. (II 182). He agreed that they threatened to charge him with first degree murder if he did not give a statement. (II 182, 183, 204-205). He had not spoken to anyone about the shooting before this. (II 183).

Officer Williams testified that he was the first officer to arrive on the scene, the 2600 block of Buena Vista, at about 5:50 am. (III 5). He observed Thomas in the field, in front of a tree. (II 218-220). Thomas was still alive, but did not give the name of his assailant. (II 222-223, 234). He was about 1 ½ to 2 feet from the blood

on the ground. (III 8). Williams preserved the scene. (II 226; III 6). He did not recover any shell casings. (III 6). After EMS arrived, Williams canvassed the area, but no one had witnessed the shooting. (II 224-226; III 6). He described the area as one with high drug trafficking. (II 227).

Officer Carpenter, an evidence technician, arrived at the scene at 7:30 am. (II 69-70). The deceased had already been removed. (II 75, 88-89). Carpenter observed blood under one of the two trees in the vacant lot. (II 73). There was no evidence that the body had been dragged. (II 76, 84). He searched the area for casings and bullets, but found nothing. (II 75, 85, 88). The trees were in full foliage, the grass was tall and overgrown, and there was a lot of debris in the lot, including a large pile.[9] (II 75, 79-80, 84, 90-92, 94). There were four residential houses across the street. (II 77). He measured 72 feet from the blood to the curb on Buena Vista, and about 120 feet from the blood to the porch area of the residences on the north side of the street. (II 76-77, 96).

Officer Adams testified to interviewing Lavero Crooks about his complaint of a felonious assault by Defendant, and their plan for Defendant's arrest on November 9, 2002. (III 9-16, 27). Crooks believed Defendant would be at 2675 Buena Vista. (III 13). The officers knew that Crooks sold drugs in that area. (III 14). When Crooks parked and exited his vehicle, the neighborhood grew quiet and Defendant came out onto the porch of the four family flat. (III 16, 18). Crooks and Defendant yelled at one another, and Crooks yelled to the police that this was "the motherfucker."(III 17, 29). Williams and his partner, in plain clothes (III 28, 30), ran toward Defendant and announced that they were police. Defendant ran back inside. (III 18, 30). The police found him in a locked unoccupied lower flat, and arrested him. (III 20-21). Defendant was unarmed, and there was no weapon in the flat. (III 24-25, 27-28). Adams interviewed Lavero Crooks again on November 13, 2003. (III 25-26).

Officer Bastianelli testified that he collected Carlton Thomas' clothing from the hospital. (II 214-215). There was no currency or identification in his belongings. (II 216).

Dr. Nora performed the autopsy. The deceased was shot four times: to the knee, front to back, with a slightly downward angle; to the front left side of the abdomen above the hip, front to back and slightly downward; to the left side of the abdomen, front to back, but exiting on the right side; and to the right cheek, back to front and slightly downward, exiting and re-entering near the lip. (II 34, 39-43, 45-46, 51, 57). While it was possible that the first three shots could have been fired while the deceased was on the ground, the trajectories were "a little bit difficult" for this theory. (II 62-63). There was no evidence of close-range firing; however the clothing had not been available for analysis. (II 47-48). No bullets were recovered. (II 42, 65). There were scrapes on the knees, consistent with falling near the time of death. (II 46). Alcohol and cocaine were both present in the deceased's system.

(II 48-50).

The parties stipulated that, on September 6, 2002, Defendant was ineligible to carry a firearm because of a prior felony conviction. (III 32).

Both the prosecution and the defense rested.

[4]The transcripts are referred to as follows: I = 4/2/03; II = 4/3/03; III = 4/7/03.
[5]A woman named "Lisa" lived there. (II 140, 166, 193).
[6]The witness changed this on cross-examination, saying that Defendant and Johnson both went towards the field, but that Johnson then went back to the porch. He did not hear Johnson say anything to the man. (II 147-148).
[7]On cross-examination, Crooks changed this to Defendant firing two shots from the sidewalk. (II 134-135).
[8]See also the defense cross-examination of the evidence technician as to the photographs, Pros Ex ## 4, 5, 8, 9, at II 88-97; and the defense closing argument at III 71-72.
[9]Officer Williams also testified to there being a large pile of debris on the lot, and that [his] car was past the debris when he saw Thomas. (II 231-233; III 4-5).

Pet. App. Brf., ECF No. 7-10, PageID.771-778 (footnotes in original).

Following his convictions and sentencing, Petitioner filed an appeal of right with the Michigan Court of Appeals raising claims concerning the admission of Crooks' assault testimony and the jury instructions.   The court denied relief on those claims and affirmed Petitioner's convictions.  *People v. Houston*, No. 248742, 2004 WL 2533568 (Mich. App. Nov. 9, 2004). Petitioner filed an application for leave to appeal with the Michigan Supreme Court, which was denied.  *People v. Houston*, 472 Mich. 918, 696 N.W.2d 716 (May 31, 2005).

In August, 2006, Petitioner filed a motion for relief from judgment with the state trial court raising claims concerning the admission of flight evidence, the conduct of the prosecutor, the effectiveness of trial counsel (failing to object to the admission of evidence and the prosecutor's conduct, failing to assert manslaughter, and interfering with his right to testify), the sufficiency of the evidence, cumulative error, and the effectiveness of appellate counsel.   The trial court denied the motion.  *People v. Houston*, No. 03-001609-01 (Wayne Co. Cir. Ct. Nov. 15, 2006).

Petitioner filed a delayed application for leave to appeal with the Michigan Court of Appeals, which was denied.  *People v. Houston*, No. 275644 (Mich. Ct. App. June 18, 2007).  Petitioner also filed an application for leave to appeal with the Michigan Supreme Court, which was denied. *People v. Houston*, 480 Mich. 1004, 742 N.W.2d 371 (Dec. 28, 2007), recon. den., 480 Mich. 1078, 744 N.W.2d 137 (Feb. 19, 2008).

Petitioner filed his first federal habeas petition on March 6, 2008, essentially raising the same claims that he raised on direct appeal and collateral review in the state courts.  The Court denied the petition on the merits and denied a certificate of appealability.  *Houston v. Ludwick*, No. 2:08-cv-10963, 2011 WL 1135465 (E.D. Mich. March 25, 2011) (Zatkoff, J.).  Petitioner filed an appeal, but the United States Court of Appeals for the Sixth Circuit denied a certificate of appealability.  *Houston v. Perry*, No. 11-1528 (6th Cir. Jan. 5, 2012).  Petitioner filed a petition for a writ of certiorari with the United States Supreme Court, which was denied.  *Houston v. Perry*, 568 U.S. 1052 (Dec. 3, 2012).

At some point during his confinement, Petitioner discussed his case with the University of Michigan Law School's Innocence Clinic.  The Clinic conducted an investigation while deciding whether to accept him as a client.  Petitioner's 12/14/21 Aff., ECF No. 11, PageID.1205. According to Petitioner, he met fellow prisoner Tony Miller while they were both incarcerated at the Newberry Correctional Facility in 2010 and discovered that Miller "had known Nicole Thomas and generally knew about the Carlton Thomas murder."  *Id.*; ECF No. 9-14, PageID.895.  He gave this information to the Clinic at some unspecified time.  *Id*.

On October 21, 2013, Jovan Johnson (now deceased according to Respondent, ECF No. 8, PageID.188), executed an affidavit recanting his trial testimony.  He claimed that he was not at the scene with Petitioner and did not witness the shooting.  He said that he only implicated

7

Petitioner in the shooting because Lavero Crooks threatened him and he feared being killed.   He

decided to come forward because he did not want Petitioner to be locked up for something he did

not do.   Johnson's Aff., ECF No. 1, PageID.64-66.

On August 12, 2014, Tony Miller executed an affidavit in which he claimed to have

witnessed the shooting of Carlton Thomas and stated that Lavero Crooks, not Petitioner,

committed the crime.   Specifically, he claimed that he drove to scene of the shooting around 4:00-

4:30 am to pick up Nicole Thomas and was sitting in his car waiting for her to put her daughter to

bed.   About 10 or 15 minutes later, he saw two men come along, one walking and one on a bicycle,

and approach a car on the street.   Lavero Crooks, who he knew as "Big Country" as an

acquaintance through Nicole Thomas, and a woman were in the car.   The man who had been

walking and Crooks exchanged words.   Crooks exited the car and pulled out a gun.   The man

who had been on the bicycle ran away.   Crooks chased the other man into a vacant field and shot

at him.   When the man fell, Crooks stood over him and shot him again.   Crooks looked around,

then returned to his car and drove away.   Miller then drove home.   Miller stated that Nicole called

him to see if he was okay because she had heard gunshots.   He told her that he was fine and did

not know what had happened.   Miller's Aff., ECF No. 1, PageID.67-68.

On April 15, 2016, Petitioner executed an affidavit in which he claimed that he asked trial

counsel in March, 2003 to investigate the residents of the four-unit flat where he was arrested.

Those residents, which included Nicole Thomas, were identified in a police report involving

Crooks' complaint against him.   Petitioner said that he had called Nicole Thomas on the morning

of the shooting to ask her to lock the vestibule door because he had forgotten to do so when he left

and would not be returning.   According to Petitioner, counsel responded that there was no need

to interview the residents because they would have told the police if they knew anything.

8

Petitioner also stated that when he asked counsel to at least interview Nicole Thomas, counsel responded, "they all swear they're innocent even though they know that they're guilty as hell, and I end up doing extra work when they know it's for nothing."   Petitioner's 4/15/16 Aff., ECF No. 1, PageID.69-70; Police Report, ECF No. 1, PageID.62-63.

In June, 2016, Petitioner filed a second motion for relief from judgment with the state trial court raising claims that trial counsel was ineffective for failing to investigate and present an exculpatory witness at trial, that he has newly-discovered evidence showing that trial counsel was ineffective, and that he is actually innocent.   He also sought an evidentiary hearing.   Petitioner presented Johnson's recanting affidavit (dated Oct. 21, 2013), Miller's affidavit (dated Aug. 12, 2014), and his own affidavit (dated April 15, 2016) in support of his claims.   ECF No. 9-9, ECF No. 9-17, PageID.1131-1164.   The trial court found that only the second claim warranted review under Michigan Court Rule 6.508(G) and denied the motion, essentially finding that the evidence was not credible and that it was "unlikely a new trial would result in a different outcome for the defendant."   *People v. Houston*, No. 03-001609-01 (Wayne Co. Cir. Ct. Oct. 19, 2016); ECF No. 9-10.   Petitioner filed a delayed application for leave to appeal with the Michigan Court of Appeals, which was denied.   *People v. Houston*, No. 337102 (Mich. Ct. App. July 11, 2017). Petitioner also filed an application for leave to appeal with the Michigan Supreme Court, which was denied.   *People v. Houston*, 501 Mich. 1060, 910 N.W.2d 296 (May 1, 2018).

On May 23, 2018, Petitioner sought authorization from the Sixth Circuit to file a second or successive habeas petition concerning claims that the prosecution knowingly presented false testimony and that trial counsel was ineffective for failing to investigate a known witness (who could have led to an exculpatory witness).   The court appointed counsel, requested additional briefing, then stayed the case while the Wayne County Conviction Integrity Unit reviewed

Petitioner's innocence claim.   When that unit declined to provide relief, the case was reopened. The Sixth Circuit then denied Petitioner authorization to proceed on his prosecutorial misconduct/false testimony claim, but granted him authorization to proceed on his ineffective assistance of trial counsel claim.   *In re Michon Houston*, No. 18-1579 (6th Cir. Nov. 17, 2020).

On April 16, 2021, Petitioner, through counsel, filed his second federal habeas petition. ECF No. 1.   In his pleadings, he asserts that trial counsel was ineffective for failing to investigate a known witness, Nicole Thomas, who he asserts would have led to an exculpatory witness, Tony Miller.   Petitioner submits the same affidavits from Jovan Johnson, *id.* at PageID.64-66, Tony Miller, i*d.* at PageID.67-68, and himself, *id.* at PageID.69-70, that were presented to the state courts during his second round of collateral review in support of his petition, as well as a new affidavit from a fellow prisoner named Jermaine Jones (dated March 10, 2021) in which Jones indicates that people in the area were saying Crooks committed the murder and that Johnson wanted to recant his trial testimony.   *Id*. at PageID.71-72.   Respondent filed an answer to the habeas petition contending that it should be dismissed as untimely and/or denied on the merits.   ECF No. 8.   Petitioner filed a reply to that answer, ECF No. 11, along with his own new affidavit (dated Dec. 14, 2021) stating that the Innocence Clinic refused to provide him with Johnson's and Miller's affidavits until June, 2016.   *Id*. at PageID.1205-1206.   Petitioner recently filed a notice with supplemental authority.   ECF No. 15.

## III.   Discussion

### A.   Review under 28 U.S.C. § 2244(b)(4)

As an initial matter, the Court must decide whether Petitioner's habeas petition should be allowed to proceed or should be dismissed pursuant to 28 U.S.C. § 2244(b)(4) for failure to ultimately satisfy the requirements for filing a second or successive habeas petition in federal court.

28 U.S.C. § 2244(b)(2) provides:

> A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless—
>
> (A) the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and
>
> (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

Before a second or successive habeas petition is filed in a federal district court, a habeas petitioner is required to seek an order from the appropriate court of appeals authorizing the district court to consider the petition.  *See* 28 U.S.C. § 2244(b)(3)(A); *Stewart v. Martinez–Villareal*, 523 U.S. 637, 641 (1998).  Petitioner did so and received authorization to proceed on his ineffective assistance of trial counsel claim.  The Sixth Circuit's authorization order, however, is merely a determination that Petitioner has made a prima facie showing that his petition satisfies the requirements of 28 U.S.C. § 2244(b)(2).  *See Holland v. Maclaren*, No. 2:13-cv-10267, 2016 WL 795859, *5 (E.D. Mich. Feb. 29, 2016) (citing *Ferrazza v. Tessmer*, 36 F. Supp. 2d 965, 973 (E.D. Mich. 1999)).  "'Prima facie' in this context means sufficient allegations of fact together with some documentation that would 'warrant a fuller exploration in the district court.'"  *In re Lott*, 366 F.3d 431, 433 (6th Cir. 2004) (internal quotation omitted); *see also Keith v. Bobby*, 551 F.3d 555, 557 (6th Cir. 2009).  Such a "'prima facie showing' ... is not a difficult standard to meet." *Lott*, 366 F.3d at 432.

28 U.S.C. § 2244(b)(4) requires a district court to "dismiss any claim presented in a second

or successive application that the court of appeals has authorized to be filed unless the applicant shows that the claim satisfies the requirements of this section."   Thus, even after a court of appeals certifies a second or successive petition on the basis that the movant has made a prima facie showing that the statutory standard of § 2244(b) has been satisfied, the district court is required to further review the matter and dismiss the case if the second or successive petition does not ultimately satisfy the statutory standard.  *See Clark v. Nagy*, 934 F.3d 483, 490-491 (6th Cir. 2019); *In re McDonald*, 514 F.3d 539, 543 (6th Cir. 2008); *see also Tyler v. Cain*, 533 U.S. 656, 661, n. 3 (2001); *Lambert v. Horton*, No. 2:00-cv-72099, 2021 WL 4942764, *4 (E.D. Mich. Oct. 22, 2021).

Under this standard, Petitioner must satisfy a two-pronged test to be entitled to a review of the timeliness or the merits of his habeas claim.   First, he must show that "the factual predicate for his claim could not have been discovered previously through the exercise of due diligence." 28 U.S.C. § 2244(b)(2)(B)(i).   Second, he must show that "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found [him] guilty of the underlying offense."   28 U.S.C. § 2244(b)(2)(B)(ii).   Petitioner must satisfy both prongs to proceed on his ineffective assistance of counsel claim.

In this case, the Sixth Circuit acknowledged that whether Petitioner could have discovered the factual predicate for his ineffective assistance of trial counsel claim sooner through the exercise of due diligence is a "close case," and concluded that Petitioner made a prima facie showing that "a person in his circumstances … could not have discovered Miller's affidavit earlier through the exercise of reasonable diligence."   *In re Michon Houston*, No. 18-1579 at *4-5 (citation omitted).

In the context of § 2244(b)(2)(B)(i), "could not have been discovered previously" means it

could not have been found in time to be used in the first habeas action.   *Vinson v. Jackson*, 711 F. App'x 329, 333 (6th Cir. 2018).   Upon more considered review, this Court questions whether Petitioner has shown that the factual predicate for his ineffective assistance of trial counsel claim could not have been discovered previously through the exercise of due diligence.   First, by his own admission, and as noted by the Sixth Circuit, Petitioner was aware of Nicole Thomas and the possibility that she could have information about the shooting at the time of his trial in 2003. While trial counsel apparently refused to interview her before trial, Petitioner made no attempt to contact her at that time or in the many years following his convictions.   Petitioner also did not raise an ineffective assistance of trial counsel claim based on the failure to investigate or produce her at trial during his direct appeal, his state collateral review, or his first federal habeas proceeding, which cumulatively lasted from 2003 to 2012.

Second, while Petitioner contends that he did not learn of Tony Miller's proposed testimony until he received his affidavit from the Innocence Clinic in June, 2016, Petitioner admits that he first spoke to Tony Miller and learned of his alleged connection to Nicole Thomas and his presence at the scene of the shooting when they were both incarcerated at the Newberry Correctional Facility in 2010.   He then gave Miller's information to the Innocence Clinic.   ECF No. 9-14, PageID.895.   Petitioner provides no specific date for either event.[2]   Nonetheless, it appears that Petitioner was actually aware of Miller during the pendency of his first habeas petition, which was filed in this district in 2008, but was not decided until March 25, 2011 (and then was before the Sixth Circuit and the Supreme Court until December 3, 2012).   The record thus shows that Petitioner previously knew of Miller and knew or could have known that Miller had

---

[2] It is unclear when Petitioner first contacted the Innocence Clinic or when it began investigating his case.

information to support his current ineffective assistance of counsel claim with the exercise of reasonable diligence.

The record is clear that Miller did not sign his affidavit until August 12, 2014. Petitioner offers no explanation as to why he (or the Innocence Clinic for that matter) could not have obtained Miller's affidavit sooner. While the Innocence Clinic may have wanted to interview Miller and investigate Nicole Thomas, there is no explanation as to why it took four years to obtain Miller's affidavit. In its authorization order, the Sixth Circuit found that Petitioner's ability to investigate Nicole Thomas "was likely beyond [his] means as an incarcerated person prior to the Clinic's involvement," *In re Michon Houston*, No. 18-1579 at *4, but it made no such finding as to Petitioner's ability to contact Miller again (once he was known in 2010) and to obtain an affidavit from him. Petitioner simply fails to explain his delay (or the Innocence Clinic's delay) in this regard. To be sure, given that the Innocence Clinic did not represent Petitioner, the Court questions whether it was reasonable for Petitioner to solely rely upon their investigation and accept their long delay in obtaining Miller's affidavit when he was aware of the underlying facts to support his ineffective assistance of counsel claim. Given such circumstances, Petitioner fails to show that he could not have previously discovered the facts underlying his ineffective assistance of trial counsel claim with the exercise of due diligence.

In any event, even assuming that Petitioner satisfies the first prong of the §2244(b) analysis, he fails to satisfy the second prong by showing that "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found [him] guilty of the underlying offense."

The Supreme Court has indicated that § 2244(b)(2)(B)(ii) requires a petitioner to

demonstrate by clear and convincing evidence that he is innocent of the crimes for which he was convicted. *See Calderon v. Thompson*, 523 U.S. 538, 558 (1998) ("a federal court can consider a claim presented in a second or successive application only if the prisoner shows, among other things, that the facts underlying the claim establish his innocence by clear and convincing evidence"). But the Supreme Court has made it clear that a petitioner is "'actually innocent' for purposes of habeas review when, considering the evidence as a whole, 'no reasonable juror would have convicted him.'" *Keith v. Hill*, 78 F.4th 307, 315 (6th Cir. 2023), cert. den. sub nom. *Keith v. May*, 144 S. Ct. 1017 (2024) (citing *Calderon*, 523 U.S. at 540). In analyzing whether Petitioner satisfies this standard, the Court is to "look to the evidence the jury heard at trial, augmented by the evidence linked to the constitutional violations, and then make a probabilistic determination about what reasonable, properly instructed jurors would do." *Freeman v. Warren*, No. 2:17-cv-13278, 2019 WL 507089, *6 (E.D. Mich. Feb. 8, 2019) (cleaned up and citing cases); *accord Davis v. Bradshaw*, No. 1:14-cv-2854, 2016 WL 8257676, *20 (N.D. Ohio, June 16, 2016).

As to the evidence at trial, Lavero Crooks and Jovan Johnson both testified that Petitioner, Johnson, and a woman named Powder, were sitting on a house porch where they regularly sold drugs around 5:00 a.m. on the day of the shooting. They saw the victim cutting through a nearby vacant lot, and Petitioner and Johnson called out to him. Petitioner approached the victim (apparently about a drug deal) and their conversation became heated. Petitioner then shot at the victim as he tried to flee. The victim was hit and fell to the ground on his stomach. Petitioner turned him over and shot him two or three more times. As discussed by Petitioner's counsel, Crooks' testimony and Johnson's testimony were inconsistent in some respects. For example, Crooks testified that Petitioner ran into the house to grab the gun, but Johnson denied that Petitioner went into the house for the gun; and Crooks testified that Petitioner turned the victim

over and searched his pockets, but Johnson did not observe those actions.    Nevertheless, both men knew Petitioner and identified him as the shooter.    Crooks and Johnson admitted that they did not provide information to the police at the time of the shooting.    Rather, about two months after the shooting, Crooks implicated Petitioner in the crime after Petitioner threatened him with a gun and Johnson did so when he was arrested on a drug charge, and police questioned him about the shooting and threatened to charge him as an accessory if he did not give a statement.    No physical evidence linked Petitioner, or anyone else, to the crime.    Police testimony established that Petitioner attempted to evade arrest by hiding in a vacant unit of the four-unit flat.

Petitioner presents three affidavits in support of his habeas claim.    Two of those affidavits, Jovan Johnson's recanting affidavit and Jermaine Jones' affidavit, do not relate to Petitioner's sole ground for habeas relief -- that trial counsel was ineffective for failing to investigate Nicole Thomas and discover Tony Miller as a witness.    Consequently, further analysis of those affidavits is unnecessary under § 2244(b)(2), which requires that the newly-discovered evidence be connected to a constitutional error.    *See Case v. Hatch*, 731 F.3d 1015, 1038 (10th Cir. 2013) (explaining that "the inquiry under subparagraph (B)(ii) excludes any consideration of evidence not rooted in constitutional error at trial" and that [t]he factual universe does not encompass new facts that became available only after trial and that are not rooted in constitutional errors occurring during trial."); *Hill v. Sheldon*, No. 20-cv-02198, 2023 WL 8530900, *9 (N.D. Ohio Sept. 25, 2023) (report and recommendation).

Nonetheless, even if those affidavits can or must be considered, they fall short of demonstrating by clear and convincing evidence that no reasonable juror would have found Petitioner guilty.    First, as to Johnson's recanting affidavit, it is well-settled that affidavits by witnesses recanting their trial testimony are viewed with "extreme suspicion."    *McCray v.*

16

*Vasbinder*, 499 F.3d 568, 574 (6th Cir. 2007) (citing *United States v. Willis*, 257 F.3d 636, 645 (6th Cir. 2001)); *see also Turner v. Romanowski*, 409 F. App'x 922, 930 (6th Cir. 2011) ("a reasonable juror would find it difficult to find a trial witness's recantation affidavit credible because either he is lying now or he was lying then."); *Brooks v. Tennessee*, 626 F.3d 878, 897 (6th Cir. 2010) ("this court views with great suspicion the recantation testimony of trial witnesses in postconviction proceedings"). This is particularly true where the recantation occurs long after trial. *See, e.g., Lewis v. Smith*, 110 F. App'x 351, 355 (6th Cir. 2004) (district court properly rejected as suspicious a witness's recanting affidavit made two years after trial). In this case, Johnson signed his recanting affidavit in 2013 – 11 years after the crime and 10 years after the trial. His recantation is thus highly questionable and a reasonable juror could surely discount it in favor of his trial testimony.

Second, Jermaine Jones' affidavit is unreliable because he is a convicted felon who was incarcerated at the time he executed his affidavit and is serving a lengthy sentence. *See* Offender Profile, Michigan Department of Corrections' Offender Tracking Information System (OTIS"), https:/mdocweb.state.mi.us/otis2/otis2profile.aspx?medocNumber=249256 (showing that he was convicted of second-degree murder and felony firearm in 2012 and is confined at the Lakeland Correctional Facility). Statements by fellow prisoners are viewed with suspicion. *See Milton v. Secretary, Dep't of Corr.*, 347 F. App'x 528, 531-532 (11th Cir. 2009) (affidavits from fellow inmates and family members created after trial are not sufficiently reliable evidence to support a claim of actual innocence); *United States v. Connolly*, 504 F.3d 206, 215 (1st Cir. 2007) (recantations by convicted prisoners usually lack meaningful indicia of reliability and are "highly suspicious"); *see also Herrera v. Collins*, 506 U.S. 390, 423 (1993) ("It seems that, when a prisoner's life is at stake, he often can find someone new to vouch for him"). Jones also did not

17

sign his affidavit (attempting to implicate Crooks and corroborate Johnson's desire to recant) until March, 2021 – 18 years after the crime. As discussed, affidavits filed long after the crime are inherently suspicious and unreliable. Moreover, Jones' affidavit consists of hearsay and does not provide direct evidence of Petitioner's innocence. Hearsay is presumptively unreliable and insufficient to establish actual innocence. *See Bell v. Howes*, 701 F. App'x, 408, 412 (6th Cir. 2017) (citing *Herrera*, 506 U.S. at 417); *Knickerbocker v. Wolfenbarger*, 212 F. App'x 426, 433 (6th Cir. 2007).

This brings the Court to Tony Miller's affidavit, in which he claims that he saw Lavero Crooks shoot the victim. Such new evidence is clearly connected to Petitioner's claim that trial counsel was ineffective for failing to interview Nicole Thomas (who he claims would have led to Miller), and it must therefore be considered by the Court. At the outset, the Court finds that Miller's affidavit is highly suspect. Miller is a convicted felon who was incarcerated when he executed his affidavit and is serving a life sentence. *See* Offender Profile, OTIS, https:/mdocweb.state.mi.us/otis2/otis2profile.aspx?medocNumber=419276 (showing that he was convicted of first-degree murder, assault with intent to commit murder, and felony firearm in 2004 and is confined at the Carson City Correctional Facility). As discussed, statements by fellow prisoners are viewed with suspicion. *See Milton.*, 347 F. App'x at 531-532; *Connolly*, 504 F.3d at 215; *see also Mendez v. Graham*, No. 11-CV-5492, 2012 WL 6594456, *11-12 (E.D.N.Y. Dec. 18, 2012) (fellow inmate's affidavit, executed after meeting petitioner in prison, and confessing to crime, was unreliable); *Torres v. Graham*, No. 06-CV-508, 2009 WL 4730313, *4 n. 8 (W.D.N.Y. Dec. 5, 2009) (affidavits from fellow inmates who were supposedly present at the shooting and alleged that petitioner was not the shooter were unreliable); *see also Herrera*, 506 U.S. at 423 ("It seems that, when a prisoner's life is at stake, he often can find someone new to vouch for him").

18

Additionally, Miller signed his affidavit only after being incarcerated with Petitioner – and did so 12 years after the crime and 11 years after the trial.   New statements from witnesses years after a crime are inherently suspect, *see Schlup v. Delo*, 513 U.S. 298, 331 (1995), and long-delayed affidavits like Miller's which seek to exonerate the petitioner and shift blame for the crime to another person are viewed with "a fair degree of skepticism." *Herrera*, 506 U.S. at 423 (O'Connor, J., concurring); *see also Freeman v. Trombley*, 483 F. App'x 51, 59-60 (6th Cir. 2012) (discounting credibility of girlfriend's alibi affidavit submitted long after trial); *Harris v. Smith*, No. 2:12-CV-14210, 2013 WL 3873168, *5 (E.D. Mich. July 25, 2013) ("Long delayed statements are viewed with extreme suspicion."); *see also McQuiggin v. Perkins*, 569 U.S. 383, 387 (2013) (stating that a court should consider "unjustifiable delay on a habeas petitioner's part ... as a factor in determining whether actual innocence has been reliably shown").   This is particularly so here where Miller only came forward after meeting Petitioner in prison and there is no independent evidence indicating that he was present at the scene of the crime.

Even absent its inherently suspect nature, Miller's affidavit contains statements that call its veracity into question such that a reasonable juror could discount it in favor of the testimony presented at trial.   For example, Miller states that he was sitting in his car between 4:00 a.m. and 5:00 a.m. waiting to pick up Nicole Thomas while she "put her daughter to bed" when he witnessed Crooks shoot the victim.   Miller, however, fails to offer any reason why he was picking up Nicole Thomas at that hour of the morning, or where they were planning to go.   Moreover, it appear unusual that someone would be putting their daughter to bed between 4:00 a.m. and 5:00 a.m. While Miller's version of events is consistent with some of the evidence presented at trial, such as the victim's injuries, Crooks' car and his female passenger, and the presence of a bicycle near the

scene,[3] it obviously conflicts with Crooks' and Johnson's trial testimony that Petitioner committed the shooting. Significantly, Miller's claim that he was present at the scene is not corroborated by any witnesses at trial and Petitioner fails to offer any independent corroboration, e.g., an affidavit from Nicole Thomas, before this Court. Additionally, Miller admits that he never told Nicole Thomas that he witnessed the shooting. He also never came forward on his own to report what he saw to the police, despite the fact that he knew both Crooks and Petitioner at the time of the shooting, and he offers no explanation for not doing so. Given such circumstances, Petitioner fails to establish by clear and convincing evidence that, but for constitutional error, no reasonable juror would have convicted him of the crime. He thus ultimately fails to satisfy the gatekeeping requirements of § 2244(b) such that his successive habeas petition must be dismissed.

The Court, however, recognizes that whether Petitioner has shown that he should be entitled to proceed under the foregoing standards could be seen as a close question. Consequently, the Court shall also, and alternatively, address the timeliness and the merits of his ineffective assistance of trial counsel claim.

**B.    Timeliness**

As an initial matter, Respondent contends that the habeas petition should be dismissed because it is untimely. The Sixth Circuit's decision to grant Petitioner authorization to file a second or successive habeas petition under 28 U.S.C. § 2244(b) does not constitute a finding that his current petition is timely, nor does it preclude this Court from considering the timeliness of the petition and/or concluding that it is untimely under the one-year statute of limitations applicable to federal habeas actions. *See Davis v. Bradshaw*, 900 F.3d 315, 325 (6th Cir. 2018); *In re*

---

[3]The Court notes that such facts could have been easily obtained from Petitioner and/or the state court record.

*McDonald*, 514 F.3d at 543-544.   Accordingly, the Court shall consider the timeliness of the habeas petition.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2241 *et seq.*, became effective on April 24, 1996.   The AEDPA includes a one-year period of limitations for habeas petitions brought by prisoners challenging state court judgments.   The statute provides:

(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.   The limitation period shall run from the latest of--

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).   A habeas petition filed outside the allotted time period must be dismissed. *See Isham v. Randle*, 226 F.3d 691, 694-695 (6th Cir. 2000) (dismissing case filed 13 days late); *Wilson v. Birkett*, 192 F. Supp. 2d 763, 765 (E.D. Mich. 2002).

In this case, the timeliness of the habeas petition depends on when Petitioner discovered or could have discovered the factual predicate for his ineffective assistance of trial counsel claim through the exercise of due diligence.   Under § 2244(d)(1)(D), the limitations period begins to

21

run when a petitioner knows, or through due diligence, could have discovered, the important facts for a habeas claim, not when the petitioner recognizes the legal significance of those facts. *Smith v. Meko*, 709 F. App'x 341, 344 (6th Cir. 2017); *Redmond v. Jackson*, 295 F. Supp. 2d 767, 771 (E.D. Mich. 2003). "The question under the provision is not when prisoners first learned of the new evidence; it is when they should have learned of the new evidence had they exercised reasonable care." *Townsend v. Lafler*, 99 F. App'x 606, 608 (6th Cir. 2004); *see also Brooks v. McKee*, 307 F. Supp. 2d 902, 905-906 (E.D. Mich. 2004) (citing cases). The start of the limitations period "does not await the collection of evidence which supports the facts." *Brooks*, 307 F. Supp. at 906. A habeas petitioner bears the burden of showing due diligence in discovering the factual predicate for his or her claims. *DiCenzi v. Rose*, 452 F.3d 465, 471 (6th Cir. 2006).

As discussed *supra*, a reasonable argument can be made that Petitioner was aware of the factual predicate underlying his ineffective assistance of trial counsel claim at the time of his trial in 2003 because he was aware of Nicole Thomas, he thought she could potentially provide information about the shooting, and he knew that counsel refused to investigate and/or call her as a witness. Despite this knowledge, Petitioner did not attempt to contact her or to raise the issue of trial counsel's failure to contact her, while seeking relief on direct appeal, collateral review, or during his initial habeas proceedings (from 2003 to 2012). Thus, Petitioner arguably could have discovered the factual predicate for his claim sooner if he had acted with reasonable care.

Additionally, Petitioner states that he that he first spoke to Tony Miller and learned of his alleged connection to Nicole Thomas and his presence at the scene of the shooting when they were both incarcerated at the Newberry Correctional Facility in 2010. He then gave Miller's information to the Innocence Clinic. ECF No. 9-14, PageID.895. Petitioner thus discovered the factual predicate for his ineffective assistance of counsel claim sometime in 2010 when he spoke

22

with Miller in prison.   Again, the term "factual predicate" means the facts underlying the claim -
- and the factual predicate date is not based on the collection of evidence to support the facts.   *See,
e.g.*, *Brooks*, 307 F. Supp. 2d at 906 ("It is the actual or putative knowledge of the pertinent facts
of a claim that starts the clock running; the accrual of the statute of limitations does not await the
collection of evidence which supports the facts."); *accord Earl v. Fabian*, 556 F.3d 717, 726 (8th
Cir. 2009); *Flanagan v. Johnson*, 154 F.3d 196, 198-199 (5th Cir. 1998) (ruling that it is knowledge
of the facts, not an affidavit supporting those facts, that triggers the factual predicate date); *Tate v.
Pierson*, 177 F. Supp. 2d 792, 800 (N.D. Ill. 2001) ("Accrual does not await the collection of
evidence supporting the facts, including possible supporting affidavits.").   Petitioner thus had one
year from the unspecified date in 2010 to file his federal habeas petition absent any time during
which a properly filed application for State post-conviction or other collateral review was pending.

Petitioner's first habeas proceedings were pending in federal court until December 3, 2012.
While the time in which the case was pending in federal court is not statutorily tolled, *see Duncan
v. Walker*, 533 U.S. 167, 181-182 (2001), such time is equitably tolled.   *See Johnson v. Warren*,
344 F. Supp. 2d 1081, 1088-1089 (E.D. Mich. 2004).   Thus, the one-year period began running
at the latest on December 3, 2012 and expired one-year later on December 3, 2013.   Petitioner,
however, did not file his state court motion for relief from judgment raising his current habeas
claim until June, 2016 – well after the one-year period had expired.[4]   His habeas petition is

---

[4]Even if the one-year period began when Miller signed his affidavit on August 12, 2014, the petition is still untimely
because more than one year ran before Petitioner sought state collateral review in June, 2016.   While he asserts that
the Innocence Clinic refused to give him Miller's affidavit during that period, he offers no supporting documents or
evidence (other than his own affidavit).   Conclusory allegations without evidentiary support are insufficient on
habeas review.   *See Workman v. Bell*, 178 F.3d 759, 771 (6th Cir. 1998); *see also Wogenstahl v. Mitchell*, 668 F.3d
307, 335-336 (6th Cir. 2012); *Washington v. Renico*, 455 F.3d 722, 733 (6th Cir. 2006) (conclusory allegations do
not provide a basis for an evidentiary hearing).   The Court finds it hard to believe that the Innocence Clinic would
refuse to provide a prisoner with beneficial material (or at least its contents) for such a lengthy period of time.
Nonetheless, any delay by the Innocence Clinic does not excuse Petitioner's own failure to act.

therefore untimely and subject to dismissal.

The United States Supreme Court has confirmed that the one-year statute of limitations is not a jurisdictional bar and is subject to equitable tolling. *Holland v. Florida*, 560 U.S. 631, 645 (2010). The Supreme Court has explained that a habeas petitioner is entitled to equitable tolling "only if he shows '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Id*. at 649 (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)); *see also Robertson v. Simpson*, 624 F.3d 781, 783-784 (6th Cir. 2010). A petitioner has the burden of demonstrating entitlement to equitable tolling. *Allen v. Yukins*, 366 F.3d 396, 401 (6th Cir. 2004). "Typically, equitable tolling applies only when a litigant's failure to meet a legally mandated deadline unavoidably arose from circumstances beyond that litigant's control." *Jurado v. Burt*, 337 F.3d 638, 642 (6th Cir. 2003) (quoting *Graham Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 560 (6th Cir. 2000)). The doctrine of equitable tolling is applied "sparingly." *Watkins v. Deangelo-Kipp*, 854 F.3d 846, 851 (6th Cir. 2017); *see also National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

Petitioner asserts that he is entitled to equitable tolling because he is incarcerated and the Innocence Clinic "refused" to share Miller's affidavit with him despite his requests for information. The fact that Petitioner is incarcerated, is untrained in the law, was proceeding without a lawyer or legal assistance for a period of time, and/or may have been unaware of the statute of limitations does not warrant tolling. *See Keeling v. Warden, Lebanon Corr. Inst.*, 673 F.3d 452, 464 (6th Cir. 2012) (pro se status is not an extraordinary circumstance); *Allen*, 366 F.3d at 403 (ignorance of the law does not justify tolling); *Rodriguez v. Elo*, 195 F. Supp. 2d 934, 936 (E.D. Mich. 2002) (the law is "replete with instances which firmly establish that ignorance of the

24

law, despite a litigant's pro se status, is no excuse" for failure to follow legal requirements); *Sperling v. White*, 30 F. Supp. 2d 1246, 1254 (C.D. Cal. 1998) (citing cases stating that ignorance of the law, illiteracy, and lack of legal assistance do not justify tolling).   It is axiomatic that federal courts require prisoners to comply with the statute of limitations despite their incarceration.

Moreover, as discussed, Petitioner admits that he was aware of Miller and his relevance to the case when they met in prison in 2010.   Yet Petitioner did not attempt to obtain a statement from him for four years.   Petitioner offers no explanation for why he (or the Innocence Clinic) was unable to do so in a timely manner.   His reliance upon the Innocence Clinic to investigate his case does not excuse his own lack of diligence.   *See, e.g., Allison v. Smith*, No. 2:14-CV-10423, 2014 WL 2217238, *5 (E.D. Mich. May 29, 2014) (citing *Smith v. Beightler*, 49 F. App'x 579, 580-581 (6th Cir. 2002), and ruling that bad advice from fellow inmate or non-lawyers does not warrant equitable tolling); *accord Chaffer v. Prosper*, 592 F.3d 1046, 1049 (9th Cir. 2010) (prisoner was not entitled to tolling due to reliance on helpers who were transferred or too busy to attend to petition); *United States v. Cicero*, 214 F.3d 199, 204-205 (D.C. Cir. 2000) (federal inmate not entitled to tolling due to reliance on jailhouse lawyer who was put in segregation); *Paige v. United States*, 171 F.3d 559, 561 (8th Cir. 1999) (tolling not warranted where petitioner relied upon an inmate from another prison and pleadings were delayed); *Gurule v. Cate*, No. ED CV 12-823-DPP (PLA), 2012 WL 6147874, *6 (C.D. Cal. Nov. 6, 2012) (untimeliness not excused by petitioner's reliance on family members who were too busy to assist him in securing counsel). Delays by the Innocence Clinic are imputed to Petitioner because any reliance on their investigation "'does not relieve [him] from the personal responsibility of complying with the law.'"   *Chaffer*, 592 F.3d at 1049 (quoting *Marsh v. Soares*, 223 F.3d 1217, 1220 (10th Cir. 2000)); *see also Coleman v. Thompson*, 501 U.S. 722, 753-554 (1991) (attorney ignorance or

inadvertence does not constitute cause to excuse a procedural default because the attorney is the petitioner's agent when acting, or failing to act, and the petitioner bears the risk of such error).

To be sure, the Clinic had not agreed to represent him -- and even represented prisoners are bound by their attorneys lack of diligence.   It is well-settled that attorney miscalculation, missed deadlines, or other "garden variety" acts of negligence do not warrant equitable tolling. *See Holland*, 560 U.S. at 651-652 (citing cases); *see also Lawrence v. Florida*, 549 U.S. 327, 336 (2007) ("attorney miscalculation is simply not sufficient to warrant equitable tolling, particularly in the postconviction context where prisoners have no constitutional right to counsel"); *Young v. Westbrooks*, 702 F. App'x 255, 262 (6th Cir. 2017) (missed deadlines show negligence).

Further, to the extent that Petitioner seeks to rely on the Innocence's Clinic alleged refusal to provide him with Miller's affidavit from March, 2014 until June, 2016 to support his claim of equitable tolling, he may not do so because the one-year period had already expired.   Equitable tolling does not operate to revive an expired limitations period.  *See George v. Winn*, No. 2:15-CV-14057, 2016 WL 1182728, *3 (E.D. Mich. March 28, 2016) (citing cases); *Pinson v. Boynton*, No. 2:09-CV-13640, 2010 WL 3245405, *4 (E.D. Mich. Aug. 17, 2010); *accord Lewis v. United Air Lines, Inc.*, 117 F. Supp. 2d 434, 441 (D. N.J. 2000) (Equitable tolling "functions to halt an already running limitations period that has not expired; it does not function to revive a stale claim.").   "Events or actions occurring after the expiration of the limitations period cannot serve to extend that period or excuse [a litigant's] failure to comply with the limitations period."  *Doan v. NSK Corp.*, 266 F. Supp. 2d 629, 638 (E.D. Mich. 2003).   Petitioner fails to demonstrate that he is entitled to equitable tolling under *Holland*.

Both the United States Supreme Court and the Sixth Circuit have held that a credible claim of actual innocence may equitably toll the one-year statute of limitations.  *McQuiggin*, 569 U.S.

at 399-400; *Souter v. Jones*, 395 F.3d 577, 588-590 (6th Cir. 2005).   As explained in *Souter*, to

support a claim of actual innocence, a petitioner in a collateral proceeding "must demonstrate that,

in light of all the evidence, it is more likely than not that no reasonable juror would have convicted

him." *Bousley v. United States*, 523 U.S. 614, 623 (1998) (quoting *Schlup*, 513 U.S. at 327-328);

*see also House v. Bell*, 547 U.S. 518, 537-539 (2006).   A valid claim of actual innocence requires

a petitioner "to support his allegations of constitutional error with new reliable evidence – whether

it be exculpatory scientific evidence, trustworthy eyewitness account, or critical physical evidence

– that was not presented at trial." *Schlup*, 513 U.S. at 324.   Furthermore, actual innocence means

"factual innocence, not mere legal insufficiency." *Bousley*, 523 U.S. at 623.   In keeping with

Supreme Court authority, the Sixth Circuit has recognized that the actual innocence exception

should "remain rare" and "only be applied in the 'extraordinary case.'" *Souter*, 395 F.3d at 590

(quoting *Schlu*p, 513 U.S. at 321).

Petitioner contends that he is actually innocent based upon on Miller's affidavit, Jovan

Johnson's recanting affidavit, Jermaine Jones' affidavit, and his own assertion of innocence.

Those affidavits, however, are not reliable evidence and do not make it more likely than not that

no reasonable juror would have convicted him.

First, as discussed, Miller's affidavit is inherently suspect.   Miller is a convicted felon who

was and is currently incarcerated.   Statements by fellow prisoners are viewed with suspicion.   *See*

*Milton.*, 347 F. App'x at 531-532; *Connolly*, 504 F.3d at 215; *see also Mendez*, 2012 WL 6594456

at *11-12; *Torres*, 2009 WL 4730313 at *4 n. 8; *see also Herrera*, 506 U.S. at 423.   Miller also

signed his affidavit only after being incarcerated with Petitioner – and did so 12 years after the

crime and 11 years after the trial.   As discussed, new statements from witnesses years after a crime

are inherently suspect, *see Schlup*, 513 U.S. at 331, and such statements are viewed with "a fair

27

degree of skepticism." *Herrera*, 506 U.S. at 423; *see also Freeman*, 483 F. App'x at 59-60; *Harris*, 2013 WL 3873168 at \*5; *see also McQuiggin*, 569 U.S. at 387.   Again, this is particularly true here given that Miller only came forward after meeting Petitioner in prison and there is no independent evidence showing that he was present at the crime scene.   Miller's affidavit does not provide reliable evidence of Petitioner's actual innocence.

Second, as discussed, Jovan Johnson's recanting affidavit is unreliable because affidavits by witnesses recanting their trial testimony are viewed with "extreme suspicion," *McCray*, 499 F.3d at 574; *Turner*, 409 F. App'x at 930; *Brooks*, 626 F.3d at 897, especially when the recantation occurs long after trial.   *Lewis*, 110 F. App'x at 355.   Again, Johnson signed his recanting affidavit in 2013 – 11 years after the crime and 10 years after the trial.   His recantation is thus highly questionable and does not credibly establish Petitioner's actual innocence.

Third, Jermaine Jones' affidavit is unreliable because he too is a convicted prisoner and did not sign his affidavit (attempting to implicate Crooks and corroborate Johnson's desire to recant) until March, 2021 – 18 years after the crime.   Moreover, Jones' affidavit consists of hearsay and does not provide direct evidence of Petitioner's innocence.   Hearsay is presumptively unreliable and insufficient to establish actual innocence.   *Bell*, 701 F. App'x, at 412; *Knickerbocker*, 212 F. App'x at 433.

Lastly, Petitioner's own self-serving assertion of innocence is insufficient to support an actual innocence claim.   A "reasonable juror surely could discount [a petitioner's] own testimony in support of his own cause."   *McCray*, 499 F.3d at 573 (citing cases).   Petitioner's assertion that his habeas claim has merit also does not establish his actual innocence.   *Craig v. White*, 227 F. App'x 480, 481 (6th Cir. 2007).   In sum, the affidavits submitted by Petitioner, in light of the

28

evidence as a whole, do not provide a credible claim of actual innocence.   Petitioner fails to establish that he is entitled to equitable tolling of the one-year period.   His habeas petition is thus untimely and subject to dismissal.

### C.   Merits

Given the Court's determination that the habeas petition is untimely, it need not address merits of Petitioner's ineffective assistance of counsel claim.   Nonetheless, the Court shall do so to provide an additional and/or alternative ground for denying habeas relief in this case.   As noted, Petitioner asserts that trial counsel was ineffective for failing to investigate a known witness, Nicole Thomas, and discover an exculpatory witness, Tony Miller.   Respondent contends that this claim lacks merit.

Federal law imposes the following standard of review for habeas cases filed by prisoners challenging state court convictions:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).

"A state court's decision is 'contrary to' ... clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless

arrives at a result different from [that] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-406 (2000)); *see also Bell v. Cone*, 535 U.S. 685, 694 (2002).   "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694.   "In order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous.   The state court's application must have been "objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-521 (citations omitted); *see also Williams*, 529 U.S. at 409.   The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Lindh*, 521 U.S. at 333, n. 7); *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (per curiam)).

A state court's determination that a claim lacks merit "precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).   The Supreme Court has emphasized that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade,* 538 U.S. 63, 75 (2003)).   Pursuant to § 2254(d), a habeas court "must determine what arguments or theories supported or ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with

30

the holding in a prior decision" of the Supreme Court. *Id*. Thus, to obtain federal habeas relief, a state prisoner must show that the state court's rejection of a claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*; *see also White v. Woodall*, 572 U.S. 415, 419-420 (2014). Federal judges "are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Woods v. Donald*, 575 U.S. 312, 316 (2015). A habeas petitioner cannot prevail so long as it is within the "realm of possibility" that fairminded jurists could find the state court decision reasonable. *Woods v. Etherton*, 576 U.S. 113, 118 (2016).

Section 2254(d)(1) limits a federal habeas court's review to determining whether the state court's decision comports with clearly established federal law as determined by the Supreme Court at the time the state court renders its decision. *Williams*, 529 U.S. at 412; *see also Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) (stating that the Supreme Court "has held on numerous occasions that it is not 'an unreasonable application of clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this Court") (quoting *Wright v. Van Patten*, 552 U.S. 120, 125-126 (2008) (per curiam)); *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). Section 2254(d) "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington*, 562 U.S. at 100. Furthermore, it "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002); *see also Mitchell*, 540 U.S. at 16.

The requirements of clearly established law are determined solely by Supreme Court precedent. Thus, "circuit precedent does not constitute 'clearly established federal law as determined by the Supreme Court'" and cannot provide a basis for federal habeas relief. *Parker v. Matthews*, 567 U.S. 37, 48-49 (2012) (per curiam); *see also Lopez v. Smith*, 574 U.S. 1, 2 (2014) (per curiam). Lower federal court decisions, however, may be useful in assessing the reasonableness of a state court's decision. *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007) (citing *Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003)); *Dickens v. Jones*, 203 F. Supp. 354, 359 (E.D. Mich. 2002).

A state court's factual determinations are presumed correct on federal habeas review. *See* 28 U.S.C. § 2254(e)(1). A petitioner may rebut this presumption only with clear and convincing evidence. *Warren v. Smith*, 161 F.3d 358, 360-361 (6th Cir. 1998). Habeas review is also "limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

It is well-settled that "the stringent requirements of § 2254(d) apply only to claims that were 'adjudicated on the merits in state court proceedings.'" *Bies v. Sheldon*, 775 F.3d 386, 395 (6th Cir. 2014) (citing *Cullen*). If a state court does not adjudicate a claim on the merits, AEDPA deference does not apply and federal habeas review of the claim is de novo. *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (citing *Wiggins*, 539 U.S. at 534); *Hill v. Shoop*, 11 F.4th 373, 396 (6th Cir. 2021) (citing *Hill v. Mitchell*, 842 F.3d 910, 919-920 (6th Cir. 2016)). In this case, the state trial court did not specifically consider Petitioner's ineffective assistance of trial counsel claim on collateral review, but instead evaluated his motion for relief from judgment under the newly-discovered evidence standard for bringing a successive motion under Michigan Court Rule 6.502(G). *Houston*, No. 03-001609-01 at *3; ECF No. 9-10, PageID.873. Accordingly, the

32

Court shall review the claim de novo.

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to the effective assistance of counsel.   In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court set forth a two-prong test for determining whether a habeas petitioner has received ineffective assistance of counsel.   First, a petitioner must prove that counsel's performance was deficient.   This requires a showing that counsel made errors so serious that he or she was not functioning as counsel as guaranteed by the Sixth Amendment.   *Strickland*, 466 U.S. at 687.   Second, the petitioner must establish that counsel's deficient performance prejudiced the defense.   Counsel's errors must have been so serious that they deprived the petitioner of a fair trial or appeal.   *Id*.

To satisfy the performance prong, a petitioner must identify acts that were "outside the wide range of professionally competent assistance."   *Id*. at 690.   The reviewing court's scrutiny of counsel's performance is highly deferential.   *Id*. at 689.   There is a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.   *Id.* at 690.   The petitioner bears the burden of overcoming the presumption that the challenged actions were sound trial strategy.

As to the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."   *Id*. at 694.   A reasonable probability is one that is sufficient to undermine confidence in the outcome of the proceeding.   *Id*.   "On balance, the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceeding] cannot be relied on as having produced a just result."   *Strickland*, 466 U.S. at 686.   The Supreme Court has confirmed that a federal court's

33

consideration of ineffective assistance of counsel claims arising from state criminal proceedings is quite limited on habeas review due to the deference accorded trial attorneys. *Harrington*, 562 U.S. at 105 (also ruling that the deference is doubly so when § 2254(d) applies).

Petitioner asserts that trial counsel was ineffective for failing to investigate Nicole Thomas because she "likely" would have led to the discovery of Tony Miller as a witness. It is well-settled that defense counsel must conduct a reasonable investigation into the facts of a defendant's case, or make a reasonable determination that such investigation is unnecessary. *Wiggins*, 539 U.S. at 522-523; *Strickland*, 466 U.S. at 691; *Stewart v Wolfenbarger*, 468 F.3d 338, 356 (6th Cir. 2007). The duty to investigate "includes the obligation to investigate all witnesses who may have information concerning ... guilt or innocence." *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005). That being said, decisions as to what evidence to present and whether to call certain witnesses are presumed to be matters of trial strategy. When making strategic decisions, counsel's conduct must be reasonable. *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000); *see also Wiggins*, 539 U.S. at 522-523. The failure to call witnesses or present other evidence constitutes ineffective assistance of counsel only when it deprives a defendant of a substantial defense. *Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004); *Hutchison v. Bell*, 303 F.3d 720, 749 (6th Cir. 2002).

In this case, Petitioner fails to show that trial counsel erred and/or that he was prejudiced by counsel's alleged refusal to interview Nicole Thomas. While Petitioner asserts that he told counsel that Nicole Thomas may have information about the shooting and that he called her on the morning of the shooting to ask her to lock the vestibule door, and further asserts that counsel refused to investigate Nicole Thomas, he presents no evidence (other than his own affidavit signed in 2016) to support his assertions. For example, he offers no corroboration from Nicole Thomas

about the shooting or his call or from defense counsel about his discussions with Petitioner or his investigation of Nicole Thomas (or any other potential witnesses).   Such a lack of supporting evidence casts doubt upon his claim.   *See, e.g., Carter v. Mitchell*, 443 F.3d 517, 531 (6th Cir. 2006) (petitioner "provided no basis for a finding that trial counsel's investigation was unreasonable" where he did not introduce "any statement from trial counsel describing what [counsel] did or did not do in investigating [his case]"); *see also Fitchett v. Perry*, 644 F. App'x 485, 489 (6th Cir. 2016) ("sheer speculation" of inadequate investigation does not state a claim). As the Supreme Court has stated, "[i]t should go without saying that the absence of evidence cannot overcome the strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance." *Burt v. Titlow*, 571 U.S. 12, 23 (2013) (quoting *Strickland*, 466 U.S. at 689); *Yancey v. Haas*, 742 F. App'x 980, 982-983 (6th Cir. 2018); *Stiff v. Brown*, No. 2:20-CV-251, 2023 WL 6618951, *17 (W.D. Mich. Oct. 11, 2023), cert. app. den. sub nom. *Stiff v. Storey*, No. 23-1964, 2024 WL 1841235 (6th Cir. Apr. 9, 2024).

Petitioner's assertion that counsel refused to interview Nicole Thomas because he did not want to do extra work is also somewhat belied by the record which shows that counsel asked for assistance and a warrant to produce a witness (not identified by name on the record) who had provided a statement to police, but had apparently given them a false name, and that counsel sought to investigate a potentially favorable witness, Ms. Watson, who could not be located by police. *See* 4/4/03 Trial Tr., ECF No. 9-6, PageID.639-640; 4/7/03 Trial Tr., ECF No. 9-7, PageID.632-634.   The fact that Petitioner did not raise a concern or claim regarding counsel's alleged failure to investigate Nicole Thomas on the record during his trial, his direct appeal, his state collateral review, or his first habeas case casts further doubt upon his assertions.

Additionally, setting aside Petitioner's alleged discussions with counsel and assuming that

counsel did not investigate Nicole Thomas, counsel may have reasonably determined that such an investigation was unnecessary.   The only mention of Nicole Thomas in the record (from the time of trial) before the Court is in the November, 2002 police report involving Crooks' complaint against Petitioner.   In that report, the officer notes that Nicole Thomas was a black female resident of the four-unit flat where Petitioner was arrested and that she had keys to the units.   ECF No. 1, PageID.63.   There is no indication that she had any information about the shooting.   Petitioner presents no police reports from the shooting indicating otherwise, and none of the witnesses at trial mention Nicole Thomas or report seeing her at the time of the shooting.   Faced with just the police report, counsel may have reasonably decided that there was no need to speak to Nicole Thomas. Petitioner thus fails to establish that counsel's conduct was deficient.

Nonetheless, even if counsel was deficient for failing to interview Nicole Thomas because she was a resident of the flat and/or based on Petitioner's discussions with him, Petitioner fails to establish that he was prejudiced by counsel's conduct.   He simply cannot show that Nicole Thomas would have testified about his phone call or that she would have led to the discovery of Tony Miller as a witness.   He offers no affidavit from Nicole Thomas about what she would have said had she been interviewed by counsel at the time of trial.   In the absence of such proof, Petitioner cannot establish that he was prejudiced by counsel's alleged investigative failure.   *See Burt*, 571 U.S. at 23; *Hudson v. Chapman*, No. 20-cv-10082, 2023 WL 1767754, *9 (E.D. Mich. Feb. 3, 2023) (denying habeas relief on claim involving counsel's alleged failure to consult an expert witness); *Mitchell v. Woods*, No. 15-cv-10764, 2016 WL 7369864, *6 (E.D. Mich. Dec. 20, 2016) ("Absent any affidavit or other evidence establishing what a potential witness would specifically say that would be exculpatory, Petitioner cannot establish ineffective assistance of counsel…").

Any claims about what Nicole Thomas would have said in an interview are purely speculative. The only evidence linking her to Miller is Miller's own affidavit, which the Court has deemed unreliable. And even if Nicole Thomas and Miller were dating at that time as Miller claims, Miller admits that he never told her that he witnessed the shooting. Thus, even if counsel had interviewed Nicole Thomas, she may have denied knowing anything about the shooting and not mentioned Miller at all. The Court has no way of verifying what Nicole Thomas would have said absent some evidence from her. It is Petitioner's burden to establish that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. He fails to do so. Habeas relief is not warranted on this claim.

## V.    Conclusion

For the reasons stated, the Court concludes that Petitioner is not entitled to federal habeas relief on his ineffective assistance of counsel claim. Accordingly, the Court **DENIES** and **DISMISSES WITH PREJUDICE** the petition for a writ of habeas corpus.

Before Petitioner may appeal the Court's decision, a certificate of appealability must issue. *See* 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b). A certificate of appealability may issue only if a habeas petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a district court denies relief on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the court's assessment of the claim debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484-485 (2000). When a district court denies relief on procedural grounds, a certificate of appealability should issue if it is shown that reasonable jurists would find it debatable whether the petitioner states a valid claim of the denial of a constitutional right, and would find it debatable whether the court was correct in its procedural ruling. *Id*. Petitioner makes such a showing as to the Court's procedural

and substantive rulings in this case.   Accordingly, the Court **GRANTS** Petitioner a certificate of

appealability.

       **IT IS SO ORDERED**.


Dated: September 30, 2024                  s/Sean F. Cox             
                                               Sean F. Cox
                                             U. S. District Judge


I hereby certify that on September 30, 2024, the document above was served on counsel and/or the parties of record via electronic means and/or First Class Mail.

                                           s/J. McCoy        
                                           Case Manager